# UNITED STATES *v.* MENDENHALL

No. 78–1821.   Argued February 19, 1980—Decided May 27, 1980

STEWART, J., announced the Court's judgment and delivered an opinion of the Court with respect to Parts I, II–B, II–C, and III, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined, and an opinion with respect to Part II–A, in which REHNQUIST, J., joined. POWELL, J., filed an opinion concurring in part and concurring in the judgment, in which BURGER, C. J., and BLACKMUN, J., joined, *post*, p. 560. WHITE, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 566.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the briefs were *Solicitor General McCree* and *Assistant Attorney General Heymann.*

*F. Randall Karfonta* argued the cause and filed a brief for respondent.*

MR. JUSTICE STEWART announced the judgment of the Court and delivered an opinion, in which MR. JUSTICE REHNQUIST joined.†

The respondent was brought to trial in the United States District Court for the Eastern District of Michigan on a

---

*\*Fred E. Inbau, Wayne W. Schmidt, Frank G. Carrington, Jr.,* and *James P. Manak* filed a brief for Americans for Effective Law Enforcement, Inc., as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Bruce J. Ennis, Jr.,* for the American Civil Liberties Union; and by *Terence F. MacCarthy* and *Carol A. Brook* for the National Legal Aid and Defender Association.

†THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE POWELL also join all but Part II–A of this opinion.

charge of possessing heroin with intent to distribute it. She moved to suppress the introduction at trial of the heroin as evidence against her on the ground that it had been acquired from her through an unconstitutional search and seizure by agents of the Drug Enforcement Administration (DEA). The District Court denied the respondent's motion, and she was convicted after a trial upon stipulated facts. The Court of Appeals reversed, finding the search of the respondent's person to have been unlawful. We granted certiorari to consider whether any right of the respondent guaranteed by the Fourth Amendment was violated in the circumstances presented by this case. 444 U. S. 822.

I

At the hearing in the trial court on the respondent's motion to suppress, it was established how the heroin she was charged with possessing had been obtained from her. The respondent arrived at the Detroit Metropolitan Airport on a commercial airline flight from Los Angeles early in the morning on February 10, 1976. As she disembarked from the airplane, she was observed by two agents of the DEA, who were present at the airport for the purpose of detecting unlawful traffic in narcotics. After observing the respondent's conduct, which appeared to the agents to be characteristic of persons unlawfully carrying narcotics,[1] the agents approached her as she was walking through the concourse, identified themselves as federal

---

[1] The agent testified that 'the respondent's behavior fit the so-called "drug courier profile"—an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs. In this case the agents thought it relevant that (1) the respondent was arriving on a flight from Los Angeles, a city believed by the agents to be the place of origin for much of the heroin brought to Detroit; (2) the respondent was the last person to leave the plane, "appeared to be very nervous," and "completely scanned the whole area where [the agents] were standing"; (3) after leaving the plane the respondent proceeded past the baggage area without claiming any luggage; and (4) the respondent changed airlines for her flight out of Detroit.

agents, and asked to see her identification and airline ticket. The respondent produced her driver's license, which was in the name of Sylvia Mendenhall, and, in answer to a question of one of the agents, stated that she resided at the address appearing on the license. The airline ticket was issued in the name of "Annette Ford." When asked why the ticket bore a name different from her own, the respondent stated that she "just felt like using that name." In response to a further question, the respondent indicated that she had been in California only two days. Agent Anderson then specifically identified himself as a federal narcotics agent and, according to his testimony, the respondent "became quite shaken, extremely nervous. She had a hard time speaking."

After returning the airline ticket and driver's license to her, Agent Anderson asked the respondent if she would accompany him to the airport DEA office for further questions. She did so, although the record does not indicate a verbal response to the request. The office, which was located up one flight of stairs about 50 feet from where the respondent had first been approached, consisted of a reception area adjoined by three other rooms. At the office the agent asked the respondent if she would allow a search of her person and handbag and told her that she had the right to decline the search if she desired. She responded: "Go ahead." She then handed Agent Anderson her purse, which contained a receipt for an airline ticket that had been issued to "F. Bush" three days earlier for a flight from Pittsburgh through Chicago to Los Angeles. The agent asked whether this was the ticket that she had used for her flight to California, and the respondent stated that it was.

A female police officer then arrived to conduct the search of the respondent's person. She asked the agents if the respondent had consented to be searched. The agents said that she had, and the respondent followed the policewoman into a private room. There the policewoman again asked the respondent if she consented to the search, and the respondent

replied that she did. The policewoman explained that the search would require that the respondent remove her clothing. The respondent stated that she had a plane to catch and was assured by the policewoman that if she were carrying no narcotics, there would be no problem. The respondent then began to disrobe without further comment. As the respondent removed her clothing, she took from her undergarments two small packages, one of which appeared to contain heroin, and handed both to the policewoman. The agents then arrested the respondent for possessing heroin.

It was on the basis of this evidence that the District Court denied the respondent's motion to suppress. The court concluded that the agents' conduct in initially approaching the respondent and asking to see her ticket and identification was a permissible investigative stop under the standards of *Terry* v. *Ohio,* 392 U. S. 1, and *United States* v. *Brignoni-Ponce,* 422 U. S. 873, finding that this conduct was based on specific and articulable facts that justified a suspicion of criminal activity. The court also found that the respondent had not been placed under arrest or otherwise detained when she was asked to accompany the agents to the DEA office, but had accompanied the agents " 'voluntarily in a spirit of apparent cooperation.' " It was the court's view that no arrest occurred until after the heroin had been found. Finally, the trial court found that the respondent "gave her consent to the search [in the DEA office] and . . . such consent was freely and voluntarily given."

The Court of Appeals reversed the respondent's subsequent conviction, stating only that "the court concludes that this case is indistinguishable from *United States* v. *McCaleb,*" 552 F. 2d 717 (CA6 1977).[2] In *McCaleb* the Court of Appeals had suppressed heroin seized by DEA agents at the Detroit Airport in circumstances substantially similar to those in the

_____

[2] The opinion of the Court of Appeals and the opinion of the District Court are both unreported.

present case.[3]   The Court of Appeals there disapproved the Government's reliance on the so-called "drug courier profile," and held that the agents could not reasonably have suspected criminal activity in that case, for the reason that "the activities of the [persons] observed by DEA agents, were consistent with innocent behavior," *id.*, at 720.   The Court of Appeals further concluded in *McCaleb* that, even if the initial approach had been permissible, asking the suspects to accompany the agents to a private room for further questioning constituted an arrest requiring probable cause.   Finally, the court in *McCaleb* held that the consent to the search in that case had not been voluntarily given, principally because it was the fruit of what the court believed to have been an unconstitutional detention.

On rehearing en banc of the present case, the Court of Appeals reaffirmed its original decision, stating simply that the respondent had not validly consented to the search "within the meaning of [*McCaleb*]."   596 F. 2d 706, 707.

## II

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."   There is no question in this case that the respondent possessed this constitutional right of personal security as she walked through the Detroit Airport, for "the Fourth Amendment protects people, not places," *Katz* v. *United States*, 389 U. S. 347, 351.   Here the Government concedes that its agents had neither a warrant nor probable cause to believe that the respondent was carrying narcotics when

---

[3] The *McCaleb* case, however, involved a circumstance not present here. Although the persons searched in that case were advised of their right to decline to give consent to the search of their luggage, they were also informed that if they refused they would be detained while the agents sought a search warrant.   552 F. 2d, at 719.   The Court of Appeals in this case evidently considered the distinction irrelevant.

the agents conducted a search of the respondent's person. It is the Government's position, however, that the search was conducted pursuant to the respondent's consent,[4] and thus was excepted from the requirements of both a warrant and probable cause. See *Schneckloth* v. *Bustamonte,* 412 U. S. 218. Evidently, the Court of Appeals concluded that the respondent's apparent consent to the search was in fact not voluntarily given and was in any event the product of earlier official conduct violative of the Fourth Amendment. We must first consider, therefore, whether such conduct occurred, either on the concourse or in the DEA office at the airport.

## A

The Fourth Amendment's requirement that searches and seizures be founded upon an objective justification, governs all seizures of the person, "including seizures that involve only a brief detention short of traditional arrest. *Davis* v. *Mississippi,* 394 U. S. 721 (1969); *Terry* v. *Ohio,* 392 U. S. 1, 16–19 (1968)." *United States* v. *Brignoni-Ponce, supra,* at 878.[5] Accordingly, if the respondent was "seized" when the DEA

---

[4] The Government has made several alternative arguments in this case.

[5] In the District Court and the Court of Appeals, the parties evidently assumed that the respondent was seized when she was approached on the airport concourse and was asked if she would show her identification and airline ticket. In its brief on the merits and oral argument in this Court, however, the Government has argued that no seizure occurred, and the respondent has joined the argument. While the Court ordinarily does not consider matters neither raised before nor decided by the courts below, see *Adickes* v. *Kress & Co.,* 398 U. S. 144, 147, n. 2, it has done so in exceptional circumstances. See *Youakim* v. *Miller,* 425 U. S. 231, 234; *Duignan* v. *United States,* 274 U. S. 195, 200. We consider the Government's contention that there was no seizure of the respondent in this case, because the contrary assumption, embraced by the trial court and the Court of Appeals, rests on a serious misapprehension of federal constitutional law. And because the determination of the question is essential to the correct disposition of the other issues in the case, we shall treat it as "fairly comprised" by the questions presented in the petition for certiorari. This Court's Rule 23 (1)(c). See *Procunier* v. *Navarette,* 434

agents approached her on the concourse and asked questions of her, the agents' conduct in doing so was constitutional only if they reasonably suspected the respondent of wrongdoing. But "[o]bviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry* v. *Ohio,* 392 U. S., at 19, n. 16.

The distinction between an intrusion amounting to a "seizure" of the person and an encounter that intrudes upon no constitutionally protected interest is illustrated by the facts of *Terry* v. *Ohio,* which the Court recounted as follows: "Officer McFadden approached the three men, identified himself as a police officer and asked for their names. . . . When the men 'mumbled something' in response to his inquiries, Officer McFadden grabbed petitioner Terry, spun him around so that they were facing the other two, with Terry between McFadden and the others, and patted down the outside of his clothing." *Id.,* at 6–7. Obviously the officer "seized" Terry and subjected him to a "search" when he took hold of him, spun him around, and patted down the outer surfaces of his clothing, *id.,* at 19. What was not determined in that case, however, was that a seizure had taken place before the officer physically restrained Terry for purposes of searching his per-

---

U. S. 555, 559–560, n. 6; *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation,* 402 U. S. 313, 320–321, n. 6.

The evidentiary record in the trial court is adequate to permit consideration of the contention. The material facts are not disputed. A major question throughout the controversy has been whether the respondent was at any time detained by the DEA agents. Counsel for the respondent has argued that she was arrested while proceeding through the concourse. The trial court and the Court of Appeals characterized the incident as an "investigatory stop." But the correctness of the legal characterization of the facts appearing in the record is a matter for this Court to determine. See *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 226; *Bumper* v. *North Carolina,* 391 U. S. 543, 548–550.

son for weapons. The Court "assume[d] that up to that point no intrusion upon constitutionally protected rights had occurred." *Id.,* at 19, n. 16. The Court's assumption appears entirely correct in view of the fact, noted in the concurring opinion of MR. JUSTICE WHITE, that "[t]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets," *id.,* at 34. Police officers enjoy "the liberty (again, possessed by every citizen) to address questions to other persons," *id.,* at 31, 32–33 (Harlan, J., concurring), although "ordinarily the person addressed has an equal right to ignore his interrogator and walk away." *Ibid.*

Similarly, the Court in *Sibron* v. *New York,* 392 U. S. 40, a case decided the same day as *Terry* v. *Ohio,* indicated that not every encounter between a police officer and a citizen is an intrusion requiring an objective justification. In that case, a police officer, before conducting what was later found to have been an unlawful search, approached Sibron in a restaurant and told him to come outside, which Sibron did. The Court had no occasion to decide whether there was a "seizure" of Sibron inside the restaurant antecedent to the seizure that accompanied the search. The record was "barren of any indication whether Sibron accompanied [the officer] outside in submission to a show of force or authority which left him no choice, or *whether he went voluntarily in a spirit of apparent cooperation* with the officer's investigation." 392 U. S., at 63 (emphasis added). Plainly, in the latter event, there was no seizure until the police officer in some way demonstrably curtailed Sibron's liberty.

We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive inter-

ference by enforcement officials with the privacy and personal security of individuals." *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 554. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

Moreover, characterizing every street encounter between a citizen and the police as a "seizure," while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety. of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. "Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. *Haynes* v. *Washington,* 373 U. S. 503, 515." *Schneckloth* v. *Bustamonte,* 412 U. S., at 225.

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.[6] Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See *Terry* v. *Ohio, supra,* at 19, n. 16; *Dunaway* v.

---

[6] We agree with the District Court that the subjective intention of the DEA agent in this case to detain the respondent, had she attempted to leave, is irrelevant except insofar as that may have been conveyed to the respondent.

*New York,* 442 U. S. 200, 207, and n. 6; 3 W. LaFave, Search and Seizure 53–55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

On the facts of this case, no "seizure" of the respondent occurred. The events took place in the public concourse. The agents wore no uniforms and displayed no weapons. They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents. They requested, but did not demand to see the respondent's identification and ticket. Such conduct, without more, did not amount to an intrusion upon any constitutionally protected interest. The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the questions was a law enforcement official. See *Terry* v. *Ohio,* 392 U. S., at 31, 32–33 (Harlan, J., concurring). See also ALI, Model Code of Pre-Arraignment Procedure § 110.1 (1) and commentary, at 257–261 (1975). In short, nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way, and for that reason we conclude that the agents' initial approach to her was not a seizure.

Our conclusion that no seizure occurred is not affected by the fact that the respondent was not expressly told by the agents that she was free to decline to cooperate with their inquiry, for the voluntariness of her responses does not depend upon her having been so informed. See *Schneckloth* v. *Bustamonte, supra.* We also reject the argument that the only inference to be drawn from the fact that the respondent acted in a manner so contrary to her self-interest is that she was compelled to answer the agents' questions. It may happen that a person makes statements to law enforcement

officials that he later regrets, but the issue in such cases is not whether the statement was self-protective, but rather whether it was made voluntarily.

The Court's decision last Term in *Brown* v. *Texas,* 443 U. S. 47, on which the respondent relies, is not apposite. It could not have been plainer under the circumstances there presented that Brown was forcibly detained by the officers. In that case, two police officers approached Brown in an alley, and asked him to identify himself and to explain his reason for being there. Brown "refused to identify himself and angrily asserted that the officers had no right to stop him," *id.,* at 49. Up to this point there was no seizure. But after continuing to protest the officers' power to interrogate him, Brown was first frisked, and then arrested for violation of a state statute making it a criminal offense for a person to refuse to give his name and address to an officer "who has lawfully stopped him and requested the information." The Court simply held in that case that because the officers had no reason to suspect Brown of wrongdoing, there was no basis for detaining him, and therefore no permissible foundation for applying the state statute in the circumstances there presented. *Id.,* at 52–53.

The Court's decisions involving investigatory stops of automobiles do not point in any different direction. In *United States* v. *Brignoni-Ponce,* 422 U. S. 873, the Court held that a roving patrol of law enforcement officers could stop motorists in the general area of an international border for brief inquiry into their residence status only if the officers reasonably suspected that the vehicle might contain aliens who were illegally in the country. *Id.,* at 881–882. The Government did not contend in that case that the persons whose automobiles were detained were not seized. Indeed, the Government acknowledged that the occupants of a detained vehicle were required to respond to the officers' questions and on some occasions to produce documents evidencing their eligibility to be in the United States. *Id.,* at 880. Moreover, stopping or diverting an automobile in transit, with the attendant opportunity for

a visual inspection of areas of the passenger compartment not otherwise observable, is materially more intrusive than a question put to a passing pedestrian, and the fact that the former amounts to a seizure tells very little about the constitutional status of the latter.  See also *Delaware* v. *Prouse,* 440 U. S. 648; *United States* v. *Martinez-Fuerte,* 428 U. S., at 556–559.

## B

Although we have concluded that the initial encounter between the DEA agents and the respondent on the concourse at the Detroit Airport did not constitute an unlawful seizure, it is still arguable that the respondent's Fourth Amendment protections were violated when she went from the concourse to the DEA office.  Such a violation might in turn infect the subsequent search of the respondent's person.

The District Court specifically found that the respondent accompanied the agents to the office " 'voluntarily in a spirit of apparent cooperation,' " quoting *Sibron* v. *New York,* 392 U. S., at 63.  Notwithstanding this determination by the trial court, the Court of Appeals evidently concluded that the agents' request that the respondent accompany them converted the situation into an arrest requiring probable cause in order to be found lawful.  But because the trial court's finding was sustained by the record, the Court of Appeals was mistaken in substituting for that finding its view of the evidence.  See *Jackson* v. *United States,* 122 U. S. App. D. C. 324, 353 F. 2d 862 (1965).

The question whether the respondent's consent to accompany the agents was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances, *Schneckloth* v. *Busta-monte,* 412 U. S., at 227, and is a matter which the Government has the burden of proving.  *Id.,* at 222, citing *Bumper* v. *North Carolina,* 391 U. S. 543, 548.  The respondent herself did not testify at the hearing.  The Government's evidence showed that the respondent was not told that she

had to go to the office, but was simply asked if she would accompany the officers. There were neither threats nor any show of force. The respondent had been questioned only briefly, and her ticket and identification were returned to her before she was asked to accompany the officers.

On the other hand, it is argued that the incident would reasonably have appeared coercive to the respondent, who was 22 years old and had not been graduated from high school. It is additionally suggested that the respondent, a female and a Negro, may have felt unusually threatened by the officers, who were white males. While these factors were not irrelevant, see *Schneckloth* v. *Bustamonte, supra,* at 226, neither were they decisive, and the totality of the evidence in this case was plainly adequate to support the District Court's finding that the respondent voluntarily consented to accompany the officers to the DEA office.

## C

Because the search of the respondent's person was not preceded by an impermissible seizure of her person, it cannot be contended that her apparent consent to the subsequent search was infected by an unlawful detention. There remains to be considered whether the respondent's consent to the search was for any other reason invalid. The District Court explicitly credited the officers' testimony and found that the "consent was freely and voluntarily given," citing *Schneckloth* v. *Bustamonte, supra.* There was more than enough evidence in this case to sustain that view. First, we note that the respondent, who was 22 years old and had an 11th-grade education, was plainly capable of a knowing consent. Second, it is especially significant that the respondent was twice expressly told that she was free to decline to consent to the search, and only thereafter explicitly consented to it. Although the Constitution does not require "proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search," *id.,* at 234 (footnote omitted), such knowledge

was highly relevant to the determination that there had been consent. And, perhaps more important for present purposes, the fact that the officers themselves informed the respondent that she was free to withhold her consent substantially lessened the probability that their conduct could reasonably have appeared to her to be coercive.

Counsel for the respondent has argued that she did in fact resist the search, relying principally on the testimony that when she was told that the search would require the removal of her clothing, she stated to the female police officer that "she had a plane to catch." But the trial court was entitled to view the statement as simply an expression of concern that the search be conducted quickly. The respondent had twice unequivocally indicated her consent to the search, and when assured by the police officer that there would be no problem: if nothing were turned up by the search, she began to undress without further comment.

Counsel for the respondent has also argued that because she was within the DEA office when she consented to the search, her consent may have resulted from the inherently coercive nature of those surroundings. But in view of the District Court's finding that the respondent's presence in the office was voluntary, the fact that she was there is little or no evidence that she was in any way coerced. And in response to the argument that the respondent would not voluntarily have consented to a search that was likely to disclose the narcotics that she carried, we repeat that the question is not whether the respondent acted in her ultimate self-interest, but whether she acted voluntarily.[7]

### III

We conclude that the District Court's determination that the respondent consented to the search of her person "freely

---

[7] It is arguable that the respondent may have thought she was acting in her self-interest, by voluntarily cooperating with the officers in the hope of receiving more lenient treatment.

and voluntarily" was sustained by the evidence and that the Court of Appeals was, therefore, in error in setting it aside. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings.

*It is so ordered.*

Mr. JUSTICE POWELL, with whom THE CHIEF JUSTICE and Mr. JUSTICE BLACKMUN join, concurring in part and concurring in the judgment.

I join Parts I, II–B, II–C, and III of the Court's opinion. Because neither of the courts below considered the question, I do not reach the Government's contention that the agents did not "seize" the respondent within the meaning of the Fourth Amendment. In my view, we may assume for present purposes that the stop did constitute a seizure.[1] I would hold—as did the District Court—that the federal agents had reasonable suspicion that the respondent was engaging in criminal activity, and, therefore, that they did not violate the Fourth Amendment by stopping the respondent for routine questioning.

I

The relevant facts may be stated briefly. The respondent arrived at the Detroit Metropolitan Airport on a flight from Los Angeles. She was the last passenger to leave the aircraft.

---

[1] Mr. JUSTICE STEWART concludes in Part II–A that there was no "seizure" within the meaning of the Fourth Amendment. He reasons that such a seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Ante,* at 554. Mr. JUSTICE STEWART also notes that " '[t]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets.' " *Ante,* at 553, quoting *Terry* v. *Ohio,* 392 U. S. 1, 34 (1968) (WHITE, J., concurring). I do not necessarily disagree with the views expressed in Part II–A. For me, the question whether the respondent in this case reasonably could have thought she was free to "walk away" when asked by two Government agents for her driver's license and ticket is extremely close.

Two agents of the Drug Enforcement Administration watched the respondent enter the terminal, walk to the baggage area, then change directions and proceed to an Eastern Airlines ticket counter. After the respondent accepted a boarding pass for a flight to Pittsburgh, the two agents approached her. They identified themselves as federal officers, and requested some identification. The respondent gave them her driver's license and airline ticket. The agents asked the respondent several brief questions. The respondent accompanied the agents to an airport office where a body search conducted by a female police officer revealed two plastic bags of heroin.

## II

*Terry* v. *Ohio,* 392 U. S. 1 (1968), establishes that a reasonable investigative stop does not offend the Fourth Amendment.[2] The reasonableness of a stop turns on the facts and circumstances of each case. In particular, the Court has emphasized (i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and expertise. See *Brown* v. *Texas,* 443 U. S. 47, 50–51 (1979); *Delaware* v. *Prouse,* 440 U. S. 648, 654–655 (1979); *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 879–883 (1975); *Terry* v. *Ohio, supra,* at 20–22.

### A

The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic

---

[2] The *Terry* Court held that the Warrant Clause of the Fourth Amendment does not apply to a "stop." This category of police conduct must survive only the Fourth Amendment's prohibition of "unreasonable searches and seizures." 392 U. S., at 20.

is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs, including heroin, may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement.

To meet this pressing concern, the Drug Enforcement Administration since 1974 has assigned highly skilled agents to the Detroit Airport as part of a nationwide program to intercept drug couriers transporting narcotics between major drug sources and distribution centers in the United States. Federal agents have developed "drug courier profiles" that describe the characteristics generally associated with narcotics traffickers. For example, because the Drug Enforcement Administration believes that most drugs enter Detroit from one of four "source" cities (Los Angeles, San Diego, Miami, or New York), agents pay particular attention to passengers who arrive from those places. See *United States* v. *Van Lewis,* 409 F. Supp. 535, 538 (ED Mich. 1976), aff'd, 556 F. 2d 385 (CA6 1977). During the first 18 months of the program, agents watching the Detroit Airport searched 141 persons in 96 encounters. They found controlled substances in 77 of the encounters and arrested 122 persons. 409 F. Supp., at 539. When two of these agents stopped the respondent in February 1976, they were carrying out a highly specialized law enforcement operation designed to combat the serious societal threat posed by narcotics distribution.

## B

Our cases demonstrate that "the scope of [a] particular intrusion, in light of all the exigencies of the case, [is] a central element in the analysis of reasonableness." *Terry* v. *Ohio, supra,* at 18, n. 15.[3] The intrusion in this case was quite

---

[3] For example, in *Delaware* v. *Prouse,* 440 U. S. 648 (1979), we considered the justification necessary for a random stop of a moving vehicle. Such stops, which may take place at night or on infrequently traveled

modest. Two plainclothes agents approached the respondent as she walked through a public area. The respondent was near airline employees from whom she could have sought aid had she been accosted by strangers. The agents identified themselves and asked to see some identification. One officer asked the respondent why her airline ticket and her driver's license bore different names. The agent also inquired how long the respondent had been in California. Unlike the petitioner in *Terry, supra,* at 7, the respondent was not physically restrained. The agents did not display weapons. The questioning was brief. In these circumstances, the respondent could not reasonably have felt frightened or isolated from assistance.

## C

In reviewing the factors that led the agents to stop and question the respondent, it is important to recall that a trained law enforcement agent may be "able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." *Brown* v. *Texas, supra,* at 52, n. 2. Among the circumstances that can give rise to reasonable suspicion are the agent's knowledge of the methods used in recent criminal activity and the characteristics of persons engaged in such illegal practices. Law enforcement officers may rely on the "characteristics of the

---

roads, interfere with freedom of movement, are inconvenient, and may be frightening. *Id.,* at 657. Thus, we held that police may not stop a moving vehicle without articulable and reasonable suspicion of unlawful activity. We explicitly distinguished our earlier decision in *United States* v. *Martinez-Fuerte,* 428 U. S. 543 (1976), which did not require individualized suspicion for the stop of a motor vehicle at a fixed checkpoint, because a checkpoint stop constitutes a "lesser intrusion" than a random stop. 440 U. S., at 656. The motorist halted at a permanent checkpoint has less reason for anxiety because he " 'can see that other vehicles are being stopped [and] can see visible signs of the officers' authority. . . .' " *United States* v. *Martinez-Fuerte, supra,* at 558, quoting *United States* v. *Ortiz,* 422 U. S. 891, 895 (1975).

area," and the behavior of a suspect who appears to be evading police contact. *United States* v. *Brignoni-Ponce*, 422 U. S., at 884–885. "In all situations the officer is entitled to assess the facts in light of his experience." *Id.*, at 885.

The two officers who stopped the respondent were federal agents assigned to the Drug Enforcement Administration. Agent Anderson, who initiated the stop and questioned the respondent, had 10 years of experience and special training in drug enforcement. He had been assigned to the Detroit Airport, known to be a crossroads for illicit narcotics traffic,[4] for over a year and he had been involved in approximately 100 drug-related arrests. App. 7–8.

The agents observed the respondent as she arrived in Detroit from Los Angeles. The respondent, who appeared very nervous, engaged in behavior that the agents believed was designed to evade detection. She deplaned only after all other passengers had left the aircraft. Agent Anderson testified that drug couriers often disembark last in order to have a clear view of the terminal so that they more easily can detect government agents. *Id.*, at 9. Once inside the terminal the respondent scanned the entire gate area and walked "very, very slowly" toward the baggage area. *Id.*, at 10 (testimony of Agent Anderson). When she arrived there, she claimed no baggage. Instead, she asked a skycap for directions to the Eastern Airlines ticket counter located in a different terminal. Agent Anderson stood in line immediately behind the respondent at the ticket counter. Although she carried an American Airlines ticket for a flight from Detroit to Pittsburgh, she asked for an Eastern Airlines ticket. An airline employee gave her an Eastern Airlines boarding pass. *Id.*, at 10–11. Agent Anderson testified that drug couriers frequently travel with-

---

[4] From 1975 through 1978, more than 135 pounds of heroin and 22 pounds of cocaine were seized at the Detroit Airport. In 1978, 1,536 dosage units of other dangerous drugs were discovered there. See 596 F. 2d 706, 708, n. 1 (CA6 1979) (Weick, J., dissenting).

out baggage and change flights en route to avoid surveillance. *Ibid.* On the basis of these observations, the agents stopped and questioned the respondent.

## III

The District Court, which had an opportunity to hear Agent Anderson's testimony and judge his credibility, concluded that the decision to stop the respondent was reasonable.[5] I agree. The public interest in preventing drug traffic is great, and the intrusion upon the respondent's privacy was minimal. The specially trained agents acted pursuant to a well-planned, and effective, federal law enforcement program. They observed respondent engaging in conduct that they reasonably associated with criminal activity. Furthermore, the events occurred in an airport known to be frequented by drug couriers.[6] In light of all of the circumstances, I would hold that the agents possessed reasonable and articulable suspicion of criminal activity when they stopped the respondent in a public place and asked her for identification.

The jurisprudence of the Fourth Amendment demands consideration of the public's interest in effective law enforcement as well as each person's constitutionally secured right to be free from unreasonable searches and seizures. In applying

---

[5] Although the Court of Appeals reversed the judgment of the District Court, it did not explicitly reject this conclusion of law. See *id.,* at 707. The dissenting judge noted that the Court of Appeals failed to take issue with the District Court's conclusion that the agents had reasonable suspicion to make the investigatory stop. *Id.,* at 709 (Weick, J.).

[6] The results of the Drug Enforcement Agency's efforts at the Detroit Airport, see *supra,* at 562, support the conclusion that considerable drug traffic flows through the Detroit Airport. Contrary to MR. JUSTICE WHITE's apparent impression, *post,* at 573–574, n. 11, I do not believe that these statistics establish by themselves the reasonableness of this search. Nor would reliance upon the "drug courier profile" necessarily demonstrate reasonable suspicion. Each case raising a Fourth Amendment issue must be judged on its own facts.

a test of "reasonableness," courts need not ignore the considerable expertise that law enforcement officials have gained from their special training and experience. The careful and commendable police work that led to the criminal conviction at issue in this case satisfies the requirements of the Fourth Amendment.

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS join, dissenting.

The Court today concludes that agents of the Drug Enforcement Administration (DEA) acted lawfully in stopping a traveler changing planes in an airport terminal and escorting her to a DEA office for a strip-search of her person. This result is particularly curious because a majority of the Members of the Court refuse to reject the conclusion that Ms. Mendenhall was "seized," while a separate majority decline to hold that there were reasonable grounds to justify a seizure. MR. JUSTICE STEWART concludes that the DEA agents acted lawfully, regardless of whether there were any reasonable grounds for suspecting Ms. Mendenhall of criminal activity, because he finds that Ms. Mendenhall was not "seized" by the DEA agents, even though throughout the proceedings below the Government never questioned the fact that a seizure had occurred necessitating a showing of antecedent reasonable suspicion. MR. JUSTICE POWELL's opinion concludes that even though Ms. Mendenhall may have been "seized," the seizure was lawful because her behavior while changing planes in the airport provided reasonable suspicion that she was engaging in criminal activity. The Court then concludes, based on the absence of evidence that Ms. Mendenhall resisted her detention, that she voluntarily consented to being taken to the DEA office, even though she in fact had no choice in the matter. This conclusion is inconsistent with our recognition that consent cannot be presumed from a

showing of acquiescence to authority, and it cannot be reconciled with our decision last Term in *Dunaway* v. *New York,* 442 U. S. 200 (1979).

I

Beginning with *Terry* v. *Ohio,* 392 U. S. 1, 16 (1968), the Court has recognized repeatedly that the Fourth Amendment's proscription of unreasonable "seizures" protects individuals during encounters with police that do not give rise to an arrest.   *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 878 (1975); *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 556 (1976); *Delaware* v. *Prouse,* 440 U. S. 648, 653 (1979). In *Terry* we "emphatically reject[ed]" the notion that a "stop" "is outside the purview of the Fourth Amendment because . . . [it is not a] 'seizure' within the meaning of the Constitution."   392 U. S., at 16.   We concluded that "the sounder course is to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security, and to make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness."   *Id.,* at 18, n. 15.   Applying this principle,

> "[w]e have recognized that in some circumstances an officer may detain a suspect briefly for questioning although he does not have 'probable cause' to believe that the suspect is involved in criminal activity, as is required for a traditional arrest.   However, we have required the officers to have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown* v. *Texas,* 443 U. S. 47, 51 (1979) (citations omitted).

Throughout the lower court proceedings in this case, the Government never questioned that the initial stop of Ms. Mendenhall was a "seizure" that required reasonable suspicion.   Rather, the Government sought to justify the stop by arguing that Ms. Mendenhall's behavior had given rise to

reasonable suspicion because it was consistent with portions of the so-called "drug courier profile," an informal amalgam of characteristics thought to be associated with persons carrying illegal drugs.[1]  Having failed to convince the Court of Appeals that the DEA agents had reasonable suspicion for the stop, the Government seeks reversal here by arguing for the first time that no "seizure" occurred, an argument that MR. JUSTICE STEWART now accepts, thereby pretermitting the question whether there was reasonable suspicion to stop Ms. Mendenhall.  MR. JUSTICE STEWART's opinion not only is

---

[1] On August 18, 1976, the Government argued in its answer to Ms. Mendenhall's suppression motion that the "investigatory stop" of Ms. Mendenhall was reasonable in light of the observations made by the DEA agents. At the suppression hearing on October 18, 1976, Agent Anderson's testimony focused on explanation of the "drug courier profile," description of Ms. Mendenhall's behavior prior to the stop, and discussion of why he thought it suspicious.  The United States Attorney at the suppression hearing told the court that "it is the Government's contention here that we have a valid investigatory stop, followed by a consent to search."  App. 28.  Noting that "[u]nder *Terry* v. *Ohio,* in order for it to be a valid stop," there must be "a reasonable suspicion that there was a crime afoot," the Government argued that the observations and experience of the DEA agents warranted a finding that reasonable suspicion existed to justify the stop.  *Id.,* at 28–30.  The District Court denied the suppression motion, holding that Agent Anderson had reasonable suspicion to justify "a *Terry* type intrusion in order to determine defendant's identity and obtain more information. . . ."  App. to Pet. for Cert. 15a.

There is no indication that the Government on appeal, before either the original panel of the Court of Appeals or the en banc court, ever questioned the understanding that the stop of Ms. Mendenhall constituted a "seizure" requiring reasonable suspicion.  Neither the majority of the en banc court nor the dissenting judge questioned the District Court's acknowledgment that reasonable suspicion was required to justify the initial stop of Ms. Mendenhall.  Even in its petition for certiorari, the Government did not ask this Court to review the question whether a "seizure" had occurred.  In the course of arguing that the quantum of suspicion necessary to justify the stop was slight, the Government did note that it was "arguable" that Ms. Mendenhall had not been "seized," but it was content to assume that she had been.  Pet. for Cert. 19.

inconsistent with our usual refusal to reverse judgments on grounds not raised below, but it also addresses a fact-bound question with a totality-of-circumstances assessment that is best left in the first instance to the trial court, particularly since the question was not litigated below and hence we cannot be sure is adequately addressed by the record before us.[2]

MR. JUSTICE STEWART believes that a "seizure" within the meaning of the Fourth Amendment occurs when an individual's freedom of movement is restrained by means of physical force or a show of authority. Although it is undisputed that Ms. Mendenhall was not free to leave after the DEA agents stopped her and inspected her identification, App. 19, MR. JUSTICE STEWART concludes that she was not "seized" because he finds that, under the totality of the circumstances,

---

[2] MR. JUSTICE STEWART's suggestion that "exceptional circumstances" justify entertaining the Government's claim that no seizure occurred, even though it was not raised below, *ante*, at 551, n. 5, is as curious as his notion that the evidentiary record "is adequate to permit consideration of the contention." *Ante*, at 552, n. 5. The principal question throughout the controversy over the initial stop was not "whether the respondent was at any time detained by the DEA agents," *ibid.*, but rather whether there was reasonable suspicion to support the stop. See *ante*, at 547, n. 1. While there was no material factual dispute concerning what the DEA agents observed that allegedly gave rise to reasonable suspicion, once the Government raised the "seizure" question before this Court, there were substantial differences between the parties concerning the nature of the encounter between Ms. Mendenhall and the DEA agents. Thus the District Court's assumption that Ms. Mendenhall had been "seized" was not based on "a serious misapprehension of federal constitutional law," *ante*, at 551, n. 5, for it just as easily could have been based on a different understanding of what the facts would show were the "seizure" question addressed in the District Court. Equally deficient is the suggestion in MR. JUSTICE STEWART's opinion that "exceptional circumstances" exist because "determination of the ['seizure'] question is essential to the correct disposition of the other issues in the case." *Ibid.* While the assumption that a "seizure" occurred makes it necessary to reach the question whether there was reasonable suspicion for the stop, it would not affect the way in which that question would be decided when reached.

a reasonable person would have believed that she was free to leave. While basing this finding on an alleged absence from the record of objective evidence indicating that Ms. Mendenhall was not free to ignore the officer's inquiries and continue on her way, MR. JUSTICE STEWART's opinion brushes off the fact that this asserted evidentiary deficiency may be largely attributable to the fact that the "seizure" question was never raised below. In assessing what the record does reveal, the opinion discounts certain objective factors that would tend to support a "seizure" finding,[3] while relying on contrary factors inconclusive even under its own illustrations of how a "seizure" may be established.[4] Moreover, although MR. JUSTICE STEWART's opinion purports to make its "seizure" finding turn on objective factors known to the person accosted, in distinguishing prior decisions holding that investigatory stops constitute "seizures," it does not rely on differences in the extent to which persons accosted could reasonably believe that they were free to leave.[5] Even if one

---

[3] Not the least of these factors is the fact that the DEA agents for a time took Ms. Mendenhall's plane ticket and driver's license from her. It is doubtful that any reasonable person about to board a plane would feel free to leave when law enforcement officers have her plane ticket.

[4] MR. JUSTICE STEWART notes, for example, that a "seizure" might be established even if the suspect did not attempt to leave, by the nature of the language or tone of voice used by the officers, factors that were never addressed at the suppression hearing, very likely because the "seizure" question was not raised.

[5] In *Brown* v. *Texas*, 443 U. S. 47, 51 (1979), and *United States* v. *Brignoni-Ponce*, 422 U. S. 873 (1975), the prosecution, as here, did not question whether the suspects who had been stopped had been "seized," given its concessions that the suspects would not have been permitted to leave without responding to the officers' requests for identification. In each case the Court recognized that a "seizure" had occurred without inquiring into whether a reasonable person would have believed that he was not free to leave. MR. JUSTICE STEWART's present attempt to distinguish the fact that stops of automobiles constitute "seizures," on the ground that it is more intrusive to visually inspect the passenger compartment of a car, confuses the question of the quantum of reasonable suspicion neces-

believes the Government should be permitted to raise the "seizure" question in this Court, the proper course would be to direct a remand to the District Court for an evidentiary hearing on the question, rather than to decide it in the first instance in this Court.[6]

## II

Assuming, as we should, that Ms. Mendenhall was "seized" within the meaning of the Fourth Amendment when she was stopped by the DEA agents, the legality of that stop turns on whether there were reasonable grounds for suspecting her of criminal activity at the time of the stop. *Brown* v. *Texas,* 443 U. S., at 51. To establish that there was reasonable suspicion for the stop, it was necessary for the police at least to "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* v. *Ohio,* 392 U. S., at 21.

At the time they stopped Ms. Mendenhall, the DEA agents' suspicion that she was engaged in criminal activity was based solely on their brief observations of her conduct at the airport.[7] The officers had no advance information that Ms. Men-

---

sary to justify such "seizures" with the question whether a "seizure" has occurred.

[6] We found that exceptional circumstances warranted consideration of a question not raised below in *Youakim* v. *Miller,* 425 U. S. 231, 234–235 (1976), which is cited in MR. JUSTICE STEWART's opinion, but there we vacated the judgment and remanded the case, holding that "the claim should be aired first in the District Court." *Id.,* at 236. Cf. *Rios* v. *United States,* 364 U. S. 253 (1960) (remanding to the trial court for determination of when an arrest occurred, after deciding probable-cause question).

[7] Officer Anderson, the DEA agent who testified at the suppression hearing, stated on cross-examination:

"Q. Did you have a tip in this case?

"A. No.

"Q. You were going strictly on what you saw in the airport, is that right?

denhall, or anyone on her flight, would be carrying drugs. What the agents observed Ms. Mendenhall do in the airport was not "unusual conduct" which would lead an experienced officer reasonably to conclude that criminal activity was afoot, *id.*, at 30, but rather the kind of behavior that could reasonably be expected of anyone changing planes in an airport terminal.

None of the aspects of Ms. Mendenhall's conduct, either alone or in combination, were sufficient to provide reasonable suspicion that she was engaged in criminal activity. The fact that Ms. Mendenhall was the last person to alight from a flight originating in Los Angeles was plainly insufficient to provide a basis for stopping her. Nor was the fact that her flight originated from a "major source city," for the mere proximity of a person to areas with a high incidence of drug activity or to persons known to be drug addicts, does not provide the necessary reasonable suspicion for an investigatory stop. *Ybarra* v. *Illinois*, 444 U. S. 85 (1979); *Brown* v. *Texas, supra; Sibron* v. *New York*, 392 U. S. 40, 62 (1968).[8]

---

"A. A number of things, what my observations, her response to statements.

"Q. I'm just asking—

"A. (Interposing) All right. Itinerary.

"Q. You're going on what happened on February 10 without any prior information?

"A. Correct.

"Q. You did not know that Sylvia Mendenhall was traveling to Detroit with narcotics, did you?

"A. No.

"Q. Nor any Negro female traveling from Los Angeles on that date carrying narcotics, did you?

"A. No." App 18.

[8] If "[t]he inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security," *Sibron* v. *New York*, 392 U. S., at 62, then the fact that a person is on a flight that originated from a major "source city" certainly is not.

Under the circumstances of this case, the DEA agents' observations that Ms. Mendenhall claimed no luggage and changed airlines were also insufficient to provide reasonable suspicion. Unlike the situation in *Terry* v. *Ohio,* 392 U. S., at 28, where "nothing in [the suspects'] conduct from the time [the officer] first noticed them until the time he confronted them and identified himself as a police officer gave him sufficient reason to negate [his] hypothesis" of criminal behavior, Ms. Mendenhall's subsequent conduct negated any reasonable inference that she was traveling a long distance without luggage or changing her ticket to a different airline to avoid detection. Agent Anderson testified that he heard the ticket agent tell Ms. Mendenhall that her ticket to Pittsburgh already was in order and that all she needed was a boarding pass for the flight.[9] Thus it should have been plain to an experienced observer that Ms. Mendenhall's failure to claim luggage was attributable to the fact that she was already ticketed through to Pittsburgh on a different airline.[10] Because Agent Anderson's suspicion that Ms. Mendenhall was transporting narcotics could be based only on "his inchoate and unparticularized suspicion or 'hunch,' " rather than "specific reasonable inferences which he is entitled to draw from the facts in light of his experience," *id.,* at 27, he was not justified in "seizing" Ms. Mendenhall.[11]

---

[9] Agent Anderson testified on cross-examination at the suppression hearing that he believed Ms. Mendenhall's failure to pick up luggage was suspicious only before he learned that she was changing planes. App. 16.

[10] We recognized in *Brown* v. *Texas,* 443 U. S., at 52, n. 2, that "a trained, experienced police officer [may be] able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." By the same token, Agent Anderson's experience on airport detail may be considered as negating any reasonable inference that Ms. Mendenhall's behavior was suspicious once he learned that she only needed a boarding pass for her flight to Pittsburgh.

[11] MR. JUSTICE POWELL's conclusion that there were reasonable grounds for suspecting Ms. Mendenhall of criminal activity relies heavily on the assertion that the DEA agents "acted pursuant to a well-planned, and

## III

Whatever doubt there may be concerning whether Ms. Mendenhall's Fourth Amendment interests were implicated during the initial stages of her confrontation with the DEA agents, she undoubtedly was "seized" within the meaning of the Fourth Amendment when the agents escorted her from the public area of the terminal to the DEA office for questioning and a strip-search of her person. In *Dunaway* v. *New York*, 442 U. S. 200 (1979), we held that a person who accompanied police officers to a police station for purposes of interrogation undoubtedly "was 'seized' in the Fourth Amendment sense," even though "he was not told he was under arrest." *Id.*, at 207, 203. We found it significant that the suspect was taken to a police station, "was never informed that he was 'free to go,'" and "would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody." *Id.*, at 212. Like the "seizure" in *Dunaway*, the nature of the intrusion to which Ms. Mendenhall was subjected when she was escorted by DEA agents to their office and detained there for questioning and a strip-search was so great that it "was in important respects indistinguishable from a traditional arrest." *Ibid.* Although Ms. Mendenhall was not told that she was under arrest, she in fact was not free to refuse to go to the DEA office

effective, federal law enforcement program." *Ante*, at 565. Yet there is no indication that the asserted successes of the "drug courier program" have been obtained by reliance on the kind of nearly random stop involved in this case. Indeed, the statistics MR. JUSTICE POWELL cites on the success of the program at the Detroit Airport, *ante*, at 562, refer to the results of searches following stops "based upon information acquired from the airline ticket agents, from [the agents'] independent police work," and occasional tips, as well as observations of behavior at the airport. *United States* v. *Van Lewis*, 409 F. Supp. 535, 538 (ED Mich. 1976), aff'd, 556 F. 2d 385 (CA6 1977). Here, however, it is undisputed that the DEA agents' suspicion that Ms. Mendenhall was engaged in criminal activity was based solely on their observations of her conduct in the airport terminal. *Supra*, at 571–572, n. 7.

and was not told that she was.[12]  Furthermore, once inside the office, Ms. Mendenhall would not have been permitted to leave without submitting to a strip-search.[13]  Thus, as in *Dunaway,*

> "[t]he mere facts that [the suspect] was not told he was under arrest, was not 'booked,' and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes, obviously do not make [the suspect's] seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny." *Id.,* at 212–213 (citation omitted).

Because the intrusion to which Ms. Mendenhall was subjected when she was escorted to the DEA office is of the same character as that involved in *Dunaway,* probable cause, which concededly was absent, was required to support the intrusion.

The Court's suggestion that no Fourth Amendment interest possessed by Ms. Mendenhall was implicated because she consented to go to the DEA office is inconsistent with *Dun-*

---

[12] Agent Anderson testified on cross-examination at the suppression hearing:

"Q. All right.  Now, when you asked her to accompany you to the DEA office for further questioning, if she had wanted to walk away, would you have stopped her?

"A. Once I asked her to accompany me?

"Q. Yes.

"A. Yes, I would have stopped her.

"Q. She was not free to leave, was she?

"A. Not at that point." App. 19.

[13] Agent Anderson testified:

"Q. Had she tried to leave that room when she was being accompanied by the female officer, would you have known?

"A. If she had attempted to leave the room?

"Q. Yes.

"A. Well yes, I could say that I would have known.

"Q. And if she had tried to leave prior to being searched by the female officer, would you have stopped her?

"A. Yes." *Id.,* at 21.

*away* and unsupported in the record. There was no evidence in the record to support the District Court's speculation, made before *Dunaway* was decided, that Ms. Mendenhall accompanied "Agent Anderson to the airport DEA Office 'voluntarily in a spirit of apparent cooperation with the [agent's] investigation,' *Sibron* v. *New York*, 392 U. S. 40, 63 (1968)." App. to Pet. for Cert. 16a. Ms. Mendenhall did not testify at the suppression hearing and the officers presented no testimony concerning what she said, if anything, when informed that the officers wanted her to come with them to the DEA office. Indeed, the only testimony concerning what occurred between Agent Anderson's "request" and Ms. Mendenhall's arrival at the DEA office is the agent's testimony that if Ms. Mendenhall had wanted to leave at that point she would have been forcibly restrained. The evidence of consent here is even flimsier than that we rejected in *Dunaway* where it was claimed that the suspect made an affirmative response when asked if he would accompany the officers to the police station. *Dunaway* v. *New York, supra,* at 223 (REHNQUIST, J., dissenting). Also in *Sibron* v. *New York,* from which the District Court culled its description of Ms. Mendenhall's "consent," we described a record in a similar state as "totally barren of any indication whether Sibron accompanied Patrolman Martin outside in submission to a show of force or authority which left him no choice, or whether he went voluntarily in a spirit of apparent cooperation with the officer's investigation." 392 U. S., at 63.[14]

The Court recognizes that the Government has the burden of proving that Ms. Mendenhall consented to accompany the officers, but it nevertheless holds that the "totality of evidence was plainly adequate" to support a finding of consent.

---

[14] In *Sibron* v. *New York,* 392 U. S., at 45, we noted that the record revealed only that "Sibron sat down and ordered pie and coffee, and, as he was eating, Patrolman Martin approached him and told him to come outside. Once outside, the officer said to Sibron, 'You know what I am after.'"

On the record before us, the Court's conclusion can only be based on the notion that consent can be assumed from the absence of proof that a suspect resisted police authority. This is a notion that we have squarely rejected. In *Bumper* v. *North Carolina*, 391 U. S. 543, 548–549 (1968), the Court held that the prosecution's "burden of proving that the consent was, in fact, freely and voluntarily given . . . cannot be discharged by showing no more than acquiescence to a claim of lawful authority." (Footnotes omitted.) *Johnson* v. *United States*, 333 U. S. 10 (1948); *Amos* v. *United States*, 255 U. S. 313 (1921). While the Government need not prove that Ms. Mendenhall knew that she had a right to refuse to accompany the officers, *Schneckloth* v. *Bustamonte*, 412 U. S. 218 (1973), it cannot rely solely on acquiescence to the officers' wishes to establish the requisite consent. The Court of Appeals properly understood this in rejecting the District Court's "findings" of consent.

Since the defendant was not present to testify at the suppression hearing, we can only speculate about her state of mind as her encounter with the DEA agents progressed from surveillance, to detention, to questioning, to seclusion in a private office, to the female officer's command to remove her clothing. Nevertheless, it is unbelievable [15] that this sequence of events involved no invasion of a citizen's constitutionally protected interest in privacy. The rule of law requires a different conclusion.

Because Ms. Mendenhall was being illegally detained at the time of the search of her person, her suppression motion should have been granted in the absence of evidence to dissipate the taint.

---

[15] "Will you walk into my parlour?" said the spider to a fly.

(You may find you have consented, without ever knowing why.)