BELSOME, J.,
Concurs With Reasons.
lil concur in the result reached by the majority but write separately to acknowledge the factual similarities to Florida v. Royer. In Royer, the Supreme Court considered whether Defendant Mark Royer had been illegally detained. Florida v. *1078 Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Mr. Royer was observed by two plain-clothes detectives while on his way to a concourse at Miami International Airport. Royer, 460 U.S. at 493, 103 S.Ct. at 1321-22. Detectives Johnson and Magdalena believed that Mr. Royer’s “appearance, mannerisms, luggage and actions fit the so-called ‘drug courier profile.’ ” Id. at 1322. Mr. Royer had purchased a one-way ticket to New York City and attached an identification tag bearing the name “Holt” to each of his two checked bags. Id.
As Mr. Royer was walking towards the concourse, he was approached by the detectives, who identified themselves and asked if Royer had a moment to speak with them. Id. at 494, 103 S.Ct. 1319. After the detectives requested his airline ticket and driver’s license, Mr. Royer produced both. The airline ticket was under the name “Holt,” while his driver’s license bore the name “Royer.” As Mr. Royer was questioned about the discrepancy, he “became noticeably more nervous.” At that time, the |2detectives advised Mr. Royer that they were narcotics investigators and had reason to suspect him of transporting narcotics. Id.
While still holding Mr. Royer’s airline ticket and identification, the detectives asked Mr. Royer to accompany them to a room adjacent to the concourse that was approximately forty feet away. Mr. Royer accompanied the officers, but said nothing in response. The room was described by one of the detectives as a large storage closet in the flight attendants’ lounge which contained a small desk and two chairs.
Without requesting Mr. Royer’s consent, Detective Johnson retrieved the “Holt” luggage from the airline and brought it to the room where Mr. Royer was sitting
with Detective Magdalena. The detectives asked Royer if he would consent to a search of the suitcases. In response, Roy-er said nothing, but unlocked one of the suitcases with a key, which the detective then opened. Drugs were discovered in that suitcase. Royer advised that he did not know the combination to the other suitcase, and when asked if he objected to the detective opening the second suitcase, he stated “no, go ahead,” and the second suitcase was pried open without objection from Mr. Royer. The second suitcase also contained drugs. Mr. Royer was subsequently placed under arrest.
Mr. Royer filed a motion to suppress the evidence in the suitcases, which the trial court denied, and Mr. Royer was convicted. The court of appeal reversed his conviction, finding that Mr. Royer was held involuntarily in the room at the airport without probable cause and that Mr. Roy-er’s detention had exceeded the scope of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) by the time Mr. Roy-er’s consent to search the suit cases was obtained. The appellate court further held that Mr. Royer’s consent to search was void because it was the result of an unlawful confinement.
|sIn affirming the appellate court, the Supreme Court acknowledged some of the factors that the appellate court to into consideration when reversing Mr. Royer’s conviction, including the fact that Mr. Roy-er was in a “small enclosed area being confronted by two police officers — a situation which presents an almost classic definition of imprisonment.” Royer, supra, 460 U.S. at 496, 103 S.Ct. at 1323.[1] The Court also noted the appellate court’s finding that when the detectives informed Royer that he was suspected of transporting narcotics, this “bolstered the finding that Royer was ‘in custody’ at the time the consent to search was given.” Id.
*1079 The Court recognized that the Fourth Amendment is not implicated when a detective simply approaches an individual in a public place and puts questions to him; “[n]or would the fact that the officer identified himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification.” Royer, 460 U.S. at 497, 103 S.Ct. at 1324 (citing United States v. Mendenhall, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)).
In Royer, as in the instant case, the State insisted that “the entire encounter was consensual and hence Royer was not being held against his will at all.” Royer, supra, 460 U.S. at 501, 103 S.Ct. at 1326. The Supreme Court “f[ound] this submission untenable.” Id. The Court acknowledged that the detectives’ request for Mr. Royer’s ticket and license was permissible; however, “when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver’s license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.” Id. at 502, 103 S.Ct. 1319. The Court found that “[tjhese circumstances surely 14amount to a show of official authority such that ‘a reasonable person would have believed he was not free to leave.’ ” Id. (quoting Mendenhall, 446 U.S. at 554, 100 S.Ct. at 1877).[2]
In this case, Detective Stovall testified that he and his partner were positioned in such a way that all persons exiting the train had to walk by them in order to exit the terminal. The only suspicious behavior that Detective Stovall testified that he noticed was Defendant’s stopping and observing the detectives as they questioned certain individuals exiting the terminal. Furthermore, the detective could not unequivocally testify that he was not still holding Defendant’s ticket and license at the time he questioned Defendant with regard to whether he was in possession of anything illegal.[3]
*1080 jñAs the Supreme Court acknowledged, however, there is no “litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop.” Royer, supra, 460 U.S. at 506, 103 S.Ct. 1819. Considering that a trial court’s ruling with respect to a motion to suppress is entitled to great weight, together with the detective’s testimony that he believed he was returning Defendant’s ticket and license at the time he questioned Defendant whether he was in possession of illegal materials, this writer cannot say that the trial court’s denial of Defendant’s motion to suppress was an abuse of discretion. Therefore, I concur in the affirmation of Defendant’s conviction and sentence.

. Internal citations omitted.

. The Court further found that although Mr. Royer consented to the detectives’ search of his luggage "while he was justifiably being detained on reasonable suspicion,” that nevertheless, "at the time Royer produced the key to his suitcase, the detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity.” Roy-er, supra, 460 U.S. at 502, 103 S.Ct. at 1326-27.

. The Detective testified as follows:
Q. Okay. And when he approaches you and you pull out your badge, are you armed at this time?
A. I am.
Q. And when you informed him that you were a police officer, you tell him you’re looking for people who are coming into the city with weapons or guns?
A. No. I explained to him that this is all voluntary. This is a voluntary, consensual stop. I explained to him that what we’re doing is checking to make sure that people are not traveling into or out of the city with illegal substance or anything that may be dangerous to the general public.
Q. Now at that point, he still had not committed any kind of crime, right?
A. No.
Q. He did hand you his I.D.?
A. He did.
Q. And he handed you his ticket for the bus or train?
A. That’s correct.
Q. And while you were holding on to his ticket and his I.D., you asked him if there’s a reason he was nervous; something along those lines?
A. The reason why I took the I.D. and the ticket stub is actually to match — to make sure the name on the ticket stub matched the name on the identification, and it was like simultaneously. I just asked him, you know, was he in possession of anything that, you know, he should not have; anything that may be dangerous to the general public.
*1080 Q. Again, just for the record, to be clear, at that time you had not done the Miranda rights that you would later do because of what he answered?
A. That's correct.
Q. At that time you had not?
A. That’s correct.
Q. And at the time that you asked that question, you were in possession of his identification and his ticket stub, correct?
A. I may have been in the process of handing it back over to him.
Q. May have?
A. I don't remember exactly how it went. But generally, I look at the—
Q. Because of his answer, he didn’t get his I.D. back, because you were going to arrest him?
⅝ ⅝ ⅜ ⅜
A. Like I say, you know, I looked at the ticket and his identification. And normally, I’m in the process of handing it back to him while I’m asking him that question. And then that's when he told me that he was in possession of a small amount of marijuana in his pocket.