**UNITED STATES of America,**

v.

**Jose VALENCIA and Lucero Valencia, Defendants.**

**No. CR 82–0471.**

United States District Court, E.D. New York.

March 11, 1983.

United States Government agents and State and City police officers on September 22, 1982, and, as unlawfully seized, cocaine and other physical evidence taken from the apartment of the defendant Jose Valencia on the same date. We held a hearing on December 28 and 29, 1982, at which testimony was taken from New York City Detective Jose Guzman, Drug Enforcement Administration ("DEA") Special Agent Joseph C. Sullivan, New York State Police Investigator Jerome F. McArdle, and Official Court Interpreter Mirta Vidal. Neither defendant took the stand to attempt to contradict any of the statements made by the Federal, State and City officers.

At approximately 7:00 PM on September 22, 1982, Messrs. Guzman and Sullivan and New York State Police Investigator Paul Krajewski were in the vicinity of 32–31 68th Street, Queens, New York (Tr. 9) at which time they observed the defendant, Lucero Valencia, leave a taxicab, walk to said premises and knock on the outer door thereof which "was opened by a young kid approximately about 9 or 10 years old" (Tr. 9). Mr. Guzman testified specifically that:

> "I walked into the foyer with Lucero Valencia. At that time I explained to her that I was a police officer, that I was looking for Jose Valencia.
>
> "At the time Lucero Valencia stated she was the wife of Jose Valencia and she had just come from Miami on a flight from Cali, Colombia.
>
> "She stated that she was there to meet her ex-husband, Jose Valencia and to pick up her children.
>
> "She stated that Jose Valencia should be there shortly.
>
> "After that she just kind of sat down on the steps, took a book and was reading the book."

(Tr. 9, 10).

This conversation took place "inside of the building. It is kind of a foyer." (Tr. 11), but outside of Mr. Valencia's apartment.

Mr. Guzman testified further that:

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Robert Stolz, Asst. U.S. Atty., for United States.

Edward Panzer, New York City, for Jose Valencia.

Paul E. Warburgh, Jr., New York City, for Lucero Valencia.

## MEMORANDUM & ORDER

PLATT, District Judge.

Defendants have moved to suppress, as involuntary, statements made by them to

"I then asked her if it would be a long time by the time the husband would get there.

"She stated he should be there tonight because he has to bring the children and she was supposed to take the children to her other apartment."

(Tr. 12).

For the next hour or so, Detective Guzman and Investigator Jerome McArdle (who had subsequently arrived at the scene) remained with Mrs. Valencia in the foyer, while the other officers (including three additional officers who had also subsequently arrived at the scene) waited outside the building. (Tr. 57–58, 99). All the agents were in plain clothes, and none ever displayed any weapons. (Tr. 109).

Special Agent Sullivan testified that at approximately 8–8:30 PM on the same evening he was outside a residence of the defendant Jose Valencia on 68th Street in Woodside, Queens (Tr. 119), when he learned that Mr. Valencia had taken "off at a high rate of speed from the area of 68th Street" (Tr. 120). He and State Investigator Krajewski then proceeded to 91st Street and 37th Avenue in Jackson Heights where they saw Mr. Valencia's car parked outside a residence at that intersection. Shortly thereafter Mr. Valencia and two small children came out of the residence and entered the car and Special Agent Sullivan walked over to the car, took his badge out of his pocket and said "Mr. Valencia" (Tr. 120–121).

Mr. Valencia said, in reply: "Yes. Police, police, police, I know." (Tr. 121), whereupon Special Agent Sullivan said "Well, I am a Police Officer. Federal Agent. Where are you going.", to which Mr. Valencia said "I go home. Home * * * 68th Street." (Tr. 121).

When Mr. Valencia arrived at his 68th Street apartment building he walked into the foyer of the building and said to Detective Gomez, "let's go inside. I don't want the people to see the police here" (Tr. 14). He then opened the apartment door, walked into the apartment and said, "okay, I know you got me, so I'll give you what I have." (Tr. 14).

Mr. Guzman asked, "What are you talking about?" (Tr. 14).

Mr. Valencia asked, "Are you talking about any narcotics?" (Tr. 14).

Detective Guzman replied, "Yes". (Tr. 14).

Mr. Valencia started to walk into a bedroom "at which time [Detective Guzman] told Jose Valencia, before you give me anything will you sign a consent to search the apartment and he stated yes." (Tr. 14–15). Thereafter Mr. Valencia signed a consent to search form. (Tr. 15).[1]

After Mr. Valencia signed the consent form, Detective Guzman and Mr. Valencia "walked into a bedroom. He [Valencia] opened a closet, reached into the closet, moved the clothes aside and reached into a pair of pants and pulled out a brown paper bag containing a few, I'd say a roughly maybe one-inch by one-inch wide by maybe two inches in length. It was more like compressed cocaine.

"He handed it to me.

"I then asked him if this was all.

"He said, no, I have some more.

"He reached again into the same pants pocket and removed another brown paper bag containing a few more of the cylinder-type white powder.

"After that I asked him if this is all you have in the apartment.

"He said if you are looking for money I also have some.

"I said yes. Will you please get it up.

"He then reached into the same closet and on one of the hangers there was a

---

1. The Consent to Search Form was in Spanish and begins by stating "I , have been 'requirido' to consent." Ms. Vidal, the official court interpreter, testified that the Spanish word requirido means "required" and not "requested" as the Government contends. Nonetheless the testimony of the detective and the balance of the form shows quite clearly that the defendant, Jose Valencia, understood that he was being requested (not required) to consent to the ensuing "search".

small brown pouch hanging. He opened the pouch and took some money which he handed to me.

"I then asked him again if he has something else. He stated that he had a scale. I then followed him into the kitchen area where he removed the plastic garbage bag from the garbage can and removed a scale that was at the bottom of the garbage pail.

"At the time he stated, Jose Valencia stated whatever his wife had that that was hers, it was not his." (Tr. 19–20).

Detective Guzman then "asked Jose Valencia if his wife had any cocaine on her and he told me he would ask her." (Tr. 20). And thereafter,

"Jose Valencia spoke to Lucero Valencia and asked her if she was carrying any cocaine (Tr. 22).

"Lucero Valencia said yes.

"I then asked Lucero Valencia where are you hiding the cocaine, in the front or in the back.

"She stated that she had it in her rectum.

"I stated that time she must be crazy because you could see she was a couple of months pregnant * * * (Tr. 22).

Detective Guzman then advised her that she would have to go to the hospital, whereupon Mrs. Valencia went into the bathroom and "after a short while she then handed me [Guzman] the plastic bag [which Guzman had given to her] containing six type cylinders of cocaine wrapped in condoms." (Tr. 23).

Detective Guzman testified that the defendant Jose Valencia was the first to advise him that the drugs possessed by the defendant Lucero Valencia were contained internally and packaged in condoms. (Tr. 23).

The condoms given to Detective Guzman by Mrs. Valencia were "the exact same shape and form [as] the ones that Jose Valencia had given me [Guzman]." (Tr. 24).

Defendants maintain that all of the evidence and statements obtained from them were procured in violation of their Fourth, Fifth and Sixth Amendment rights and should therefore be suppressed.

In large part, defendants' arguments stem from and are predicated upon the officers' unlawful detention of the defendant Lucero Valencia in the foyer of her husband's apartment building for approximately an hour or more prior to his arrival. The Government contends that the defendant Lucero Valencia was in the foyer awaiting the delivery to her by her former husband of their two children and that she was seated of her own volition on the stairway of the apartment building reading a book.

The officers, who were not in uniform and who at no time displayed weapons, told Mrs. Valencia that they were there to serve her husband with papers and that they wanted to wait for his arrival. The officers did not tell Mrs. Valencia that she was required to remain in the building, and in fact, she apparently chose to remain for a specific, pre-arranged purpose—to pick up her children. Thus, in view of the totality of circumstances surrounding this incident, it cannot be said that "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).[2]

---

**2.** Mrs. Valencia argues that the officers' detention of other people in the building while she and the officers were awaiting the arrival of her husband (Tr. 63–65, 78–81) supports the conclusion that she was also detained. Mrs. Valencia indisputably remained in the building, however, not because she was detained but because she wanted to pick up her children when they arrived with her husband. Thus, her reason for remaining there was independent of any alleged desire on the part of the officers to have her remain in the building. Moreover, contrary to defendants' contentions, this is not a *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), or *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), case. In both of those cases the defendants were questioned and made statements at the officers' headquarters, not in the more secure and comfortable surroundings of their or their former spouse's house.

Nonetheless, we do not believe that we need to decide this precise question, i.e., whether there was an unlawful detention, since no incriminating statements were made by Mrs. Valencia and nothing was taken from her during this period.

When Mr. Valencia arrived on the scene, he volunteered an invitation to Detective Guzman and the other officers to accompany him into his apartment and immediately thereafter voluntarily disclosed to Detective Guzman that he had cocaine therein. Neither the invitation nor the voluntary disclosure were in response to any questions by any of the officers. Mr. Valencia then gave his oral consent to a search of the apartment and voluntarily signed a written consent to search form after having been advised as to his rights.[3] Specifically, Detective Guzman, in obtaining Mr. Valencia's signature to the written consent form, verbally informed him in "many different ways" that he was not required to consent to the search, that he could refuse consent, that he could require that a search warrant be issued prior to any search, that any evidence obtained would be used against him, that he was entitled to consult an attorney prior to and during any search, and that he could withdraw his consent before the search was concluded. (Tr. 115–116). Thereafter, Mr. Valencia surrendered the cocaine that was hidden in his apartment.

Similar circumstances indicate the voluntariness of the answers given and the cocaine surrendered by the defendant Lucero Valencia. Following the surrender of his cocaine to the officers, Mr. Valencia spoke to his former wife and asked her if she was carrying any cocaine, to which question she replied in the affirmative. (Tr. 22). Moreover, prior to questions being put by the officer to Mrs. Valencia regarding the location of her cocaine, Mr. Valencia informed the officers that Mrs. Valencia's cocaine was possessed by her internally and was packaged in condoms. (Tr. 23–24).

It was only at this juncture that the officers proceeded to question her with respect to the specific location of the cocaine and advised her that she and her baby were in danger and would have to be taken to a hospital right away. If the officers had done otherwise at this point and one or more of the condoms had burst, they might well have been held responsible for any injury caused to Mrs. Valencia and her unborn child.

■■■ The totality of the circumstances compels a finding that the defendant Jose Valencia voluntarily invited the officers into his apartment, stated that he possessed cocaine,[4] and consented to the search of his apartment. *United States v. Mendenhall,* 446 U.S. 544, 545–546, 100 S.Ct. 1870, 1872, 64 L.Ed.2d 497 (1979); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *Miranda* warnings were not required. Similarly, in the case of Mrs. Valencia, it was her former husband, Mr. Valencia, who initially asked Mrs. Valencia if she had any cocaine in her possession, obtained an affirmative response and who advised the agents of the location of such cocaine. Thus, the voluntary admission by Mrs. Valencia that she was carrying cocaine, made as it was in response to questioning by Mr. Valencia and not in response to questioning by the officers, was an intervening act of Mrs. Valencia's free will sufficient to remove the taint of any alleged prior illegal detention. *Cf. Rawlings v. Kentucky,* 448 U.S. 98, 108, 100 S.Ct. 2556, 2563, 65 L.Ed.2d 633 (1980) (even assuming *arguendo* that prior 45 minute detention of defendant by police was illegal, defendant's

---

**3.** Detective Guzman testified that he asked Mr. Valencia if he understood the form, to which Mr. Valencia replied that he did. He also testified that it is his practice to explain the form orally. (Tr. at 115–16).

**4.** The invitation and the statement were not made in response to any request, question or statement by any officer. They were spontane-

ously given and made by Mr. Valencia. To hold that they should be suppressed under said circumstances would enable suspects to give themselves "immunity baths" where officers appeared on the scene by voluntarily producing contraband and making statements that might otherwise surface in the normal course of events and lead to their conviction.

"apparently spontaneous reactions to the discovery of his drugs" in acquaintance's purse "weigh[ed] heavily in favor" of a finding that defendant "acted of free will unaffected by the initial illegality"). In addition, *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in our opinion, does not require the suppression of statements made by a former wife to a former husband in the presence of officers under circumstances such as these. Mrs. Valencia's subsequent surrender of the cocaine to the officers was not the result of compulsion by the officers but was in her own self interest and that of her prospective child.[5]

Under the circumstances, there was nothing involuntary about any of the statements made by the defendants or the evidence given by them to the officers that requires suppression under the Fourth, Fifth and/or Sixth Amendments to the United States Constitution.

Accordingly, defendants' motions must be, and the same hereby are, denied in all respects.

SO ORDERED.

---

5. Mrs. Valencia's contention that the officers were required to read to her the *Miranda* warnings ignores the fact that it was her *husband* that asked her if she was in possession of any cocaine. The officers, who were undoubtedly concerned about her safety and the safety of the unborn child, merely inquired as to the location of the cocaine within Mrs. Valencia's body.