**UNITED STATES of America**

v.

**Terra GANDY.**

**Crim. No. 89–0002.**

United States District Court,
District of Columbia.

Jan. 25, 1989.

Richard W. Roberts, Asst. U.S. Atty.,
Washington, D.C., for U.S.

Sol Z. Rosen, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This matter came on for hearing on defendant's motion to suppress. Based on the written submissions of the parties, the court makes findings of fact [1] and enters conclusions of law as follows:

### FINDINGS OF FACT

1. On December 7, 1988 at 7:40 p.m., defendant arrived at the Greyhound–Trailways Bus Terminal, 1005 First Street, N.E., Washington, D.C., after a trip from New York.

2. Detectives Zattau, Beard, Curley and Brennan, Metropolitan Police Department officers of long experience and members of the Drug Interdiction Program, were on duty at the Terminal. Dressed in plain clothes, they were at the Terminal to survey incoming passengers.

3. One of those passengers, a male later identified as Shawn Williams,[2] was seen exiting the bus without luggage and walking quickly out of the station. Detective Beard stopped him and asked questions concerning his travel.

4. Later, defendant was seen by Detective Curley to depart from the bus and walk out of the station. She then noticed that Beard was interviewing Williams, stopped and appearing to be nervous, resumed her walk proceeding south on First Street, N.E.

5. Defendant carried no luggage and did not fit the "courier profile" employed by the police in examining incoming passengers from Florida and New York.

6. Zattau and Brennan, police officers experienced in the detection of narcotics carriers, decided to follow defendant as she proceeded down First Street, N.E. They were in an unmarked cruiser with Brennan at the wheel.

---

1. Many of the factual findings are not disputed.

2. Williams' present whereabouts are unknown.

7. Shortly thereafter, Zattau and Brennan noticed defendant walking with Williams about two blocks from the Terminal. Since they were also proceeding southward on First Street, but were on the west side of First Street, they made a U-turn and stopped along the curb facing defendant and Williams as they approached.

8. Zattau got out of the passenger side, and while standing in the street, addressed defendant, who was standing on the curb. Williams was three feet to the rear and left of defendant, and Brennan was fifteen feet away.

9. After Zattau had identified himself as a police officer, defendant agreed to answer his questions. She responded, hesitantly, that she had gotten off the bus from New York, and produced the receipt for her ticket. Defendant's Ex. 1. She would give no details as to where she was headed or where she was to meet her "friends." She answered these questions hesitantly and glanced at Williams standing nearby. Zattau then told defendant he was in the Drug Interdiction Program engaged in the duty of drug interception. Defendant, when asked by Zattau whether she would have "any problem" with his searching her coat, indicated no objection and raised her arms. It is undisputed that Zattau did not grab her or threaten her by tone of voice or by his actions, and did not display a weapon.

10. In patting defendant down, Zattau felt a "large, rough, textured material" in defendant's left pocket. Inside was a paper bag, containing 106 Ziplock plastic bags containing amounts or traces of cocaine crack.

11. Defendant was then arrested by Zattau and orally advised of her rights under *Miranda*. A search incident to the arrest produced an address book and additional quantities of crack and marijuana. Govt. Ex. 2. The total weight was 50 grams of crack or approximately 100 grams of heroin. Govt. Ex 1.

12. Defendant was taken to the precinct station and processed by Detective Beard. There, the PD47 containing the *Miranda* warning was read to her. She then signed and dated the PD47 card, including the waiver of her right to have a lawyer. Govt. Ex. 3. Defendant's assertion that she indicated a desire to have a lawyer, is not credible in view of her signature on the PD47 card and the testimony of all witnesses to the contrary.

13. When further interviewed, defendant stated that she was carrying the narcotics for Shawn Williams, in return for which she was to receive $500 and then return to New York.

14. At no time was defendant advised by Zattau that she could refuse to answer the questions he propounded to her. At no time, prior to her arrest, was she told by Zattau that she was free to conclude the interview and leave.

15. Defendant is a 19 year-old female with a 10th grade education. Despite her admitted youth, defendant impressed the court as "street smart" and sophisticated beyond her years. Her address book contained a number of "beeper" numbers.

## CONCLUSIONS OF LAW

■ 1. No Fourth Amendment seizure occurred when Zattau stopped and questioned defendant. *Florida v. Royer*, 460 U.S. 491, at 497, 103 S.Ct. 1319, at 1324, 75 L.Ed.2d 229 (1982). He was in plain clothes, did not display a weapon nor address her in a threatening manner. There is no evidence of physical coercion or intimidation. Defendant at all times was free to decline to answer questions and was free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed. 2d 497 (1980).

■ 2. As to the subsequent search, it is not disputed that "a search conducted pursuant to a valid consent is constitutionally permissible" and that the burden is on the government to prove that consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222–3, 93 S.Ct. 2041, 2045–46, 36 L.Ed.2d 854. This requires an assessment of all the surrounding circumstances.

In short, the issue of voluntariness "is a question of fact to be determined from the totality of all the circumstances" and "knowledge of the right to refuse consent is one factor to be taken into account." However, "the government need not establish such knowledge as the *sine qua non* of an effective consent." *Schneckloth, supra* at 237, 93 S.Ct. at 2053. Based on the totality of the circumstances, as previously set forth, we conclude that defendant's consent was voluntarily given and was not coerced, and that the search pursuant thereto was valid.

 3. As for defendant's subsequent statements, they were voluntarily given. Not only was defendant given a *Miranda* warning on the scene by Zattau, but at the precinct station she read her rights on PD47 and signed the PD47 card. She effectively waived her *Miranda* rights.

An order consistent with the foregoing has been entered this day.

## ORDER

Consistent with the foregoing Findings of Fact and Conclusions of Law, it is by the Court this 25th day of January, 1989

ORDERED that defendant's Motion to Suppress Tangible Evidence is denied.