Cowin, J.
The defendants Willie Ali Ball, Oyebonlale Opaleye and Ogunleye J. Olukaydoe, have each been charged in a number of indictments with larceny over $250.00 (G.L.c. 266, §30); attempted larceny (G.L.c. 274, §6); possession of a fraudulent motor vehicle license (G.L.c. 907 §24B); and fraudulent use of a credit card (G.L.c. 266, §74). Each defendant has filed a motion to suppress all evidence seized as a result of a warrantless stop by the Quincy Police on November 25, 1996. A hearing was held on March 11, 1997 at which three witnesses testified: Quincy Detective William Lanergan and Quincy Police officer Barry DeFranco. Based upon the testimony and consideration of the credibility of the witnesses, I make the following findings and rulings.
FINDINGS OF FACT
On November 26, 1996, Officer Barry DeFranco, a Quincy Police officer for ten years, was on duty in a marked police cruiser when he received radio dispatches from headquarters indicating that an anonymous call had been received stating that three black males in a black Acura with out-of-state plates were acting suspiciously in the area of the Citizens Bank at 138 Franklin Street in Quincy. Officer DeFranco proceeded to the Citizens Bank and spoke to the manager who indicated that he was unaware of any suspicious activity.
Officer DeFranco believed that the pre-Christmas season was usually a time for numerous bank robberies in Quincy. Therefore, he decided to check each of the seven banks in his sector for the named automobile. As Officer DeFranco reached the last of the seven banks, the Fleet Bank, he saw a black Acura with New York plates parked just on the other side of a stockade fence in a parking lot of a doctor’s office, which lot was adjacent to the bank parking lot. The car was not parked in the bank parking lot despite the fact that the officer observed there were empty spaces in the bank’s parking lot. The stockade fence prevented the car from being seen from the bank. Officer DeFranco called the plates into headquarters and requested backup.
The officer then parked his cruiser so that it did not block the egress of the Acura. He approached the Acura and when he got within ten feet of it, he could see the windows of the vehicle were tinted. He also saw vapors from the exhaust pipe indicating that the car motor was running. The officer observed the interior of the car and saw there was one person in the rear seat pushed against the seat pillar, slouched down so that the headrest blocked the officer’s view of him. The officer could also see a person in the driver’s seat who was also slouched down.
*636 The officer returned to his cruiser[1] and backed it fifty feet down the street away from the Acura in order to create a distance between himself and the vehicle and to get a view of anyone exiting the Fleet Bank. The officer’s backup then arrived and informed the officer that a black male was exiting the Fleet Bank. Officer DeFranco saw the black male emerge from the back door of the Fleet Bank and walk to the sidewalk. That person walked through the parking lot of the bank and headed toward the Acura. At that point, the officer saw the rear lights of the Acura become activated as the car was backed into the road from the parking lot. The officer observed the third male approach the car and get into it on the front passenger side. (The door was a four-door car.) Once the individual was in the car and “before he was even seated,”[2] the car headed out onto Whitley Street, a commercial area.
After the Acura drove down the street, the officer activated the blue lights of his cruiser and pulled the car over. The Acura pulled to the right of the road and stopped. Officer DeFranco exited his cruiser and pulled out his pistol. A second officer pulled up about six to eight feet directly behind him. At about this time, a cruiser with two detectives in it also arrived on the scene and other detectives and another uniformed police officer arrived as well. Officer DeFranco went to the driver’s side of the car and told the operator to open the window, put the car in park, turn the motor off and put the keys on the roof of the car. The operator obeyed these orders. The driver was identified as Ogunleye Olukaydoe; the person in the back seat was identified as Oyebonale Opaleye and the individual who got into the passenger side was identified as Willie Ball. All are black males.
Officer DeFranco asked the three occupants to exit the vehicle. When the three men exited the vehicle, one officer stayed with each suspect. The driver was asked if this was his car, where he was coming from and where he was going. There was no response.
Officer DeFranco went to the rear of the car and summoned Willie Ball, the man who had emerged from the bank. Officer DeFranco saw Ball put his hand in his jacket pocket and the officer asked Ball to remove his hand. The officer told Ball he was going to pat him down for weapons and did so. He had Ball put his hands on the car and spread his legs and the officer then began to search Ball. As he did so, he asked Ball where he was coming from, where he was going and if this were his car. There was no response.
As he frisked Ball, Officer DeFranco felt a bulge under Ball’s waistband where his belt and his zipper were, right under his belt buckle outside his shirt and inside his waistband. The officer believed that the bulge was consistent with a small weapon of a type he had encountered in the past. The officer removed the bulge object from the defendant and the object turned out to be a manilla envelope containing a number of credit cards and licenses. The officer removed the credit cards and licenses and saw that Mr. Ball’s photo was on four of the licenses but that each license was in a different name. The photo of the passenger in the back seat, defendant Opaleye, appeared on three of these licenses but again each license bore a different name. There were also eight credit cards contained in the envelope all corresponding to the different names on the licenses. The three defendants were arrested.
DISCUSSION
The defendants challenge the legality of the stop[3] and the ensuing pat-frisk. As to the initial stop, “[a] police officer may stop a vehicle in order to conduct a threshold inquiry if he has a reasonable suspicion that the occupants have committed, are committing, or are about to commit a crime. His suspicion must be based on specific, articulable facts and reasonable inferences drawn therefrom. A hunch will not suffice.” Commonwealth v. Wren, 391 Mass. 705, 707 (1984) (citations omitted). See Terry v. Ohio, 392 U.S. 1 (1968). In this case, there are no specific, articulable facts and reasonable inferences to be drawn therefrom that support the threshold inquiry. Although Officer DeFranco may be commended for his initiative in seeking to find the suspect automobile and its occupants, he had no more than a hunch to justify this stop.
The facts known to Officer DeFranco simply were not sufficient to support a reasonable suspicion of criminal conduct. Initially, it must be noted that no evidence indicated the source of the information that three black males in a black Acura with out-of-state plates were acting suspiciously. The record is devoid of evidence indicating that the officer responsible for issuing the radio call had sufficient information to justify a threshold stop or even that he had any reliable information about the defendants at all. As the radio broadcast does not in and of itself provide Officer DeFranco the reasonable suspicion required for a stop, the broadcast is one factor which may be taken together with other factors to constitute reasonable suspicion. See Commonwealth v. Fraser, supra, at 546.
The only other factors that could provide Officer DeFranco with reasonable suspicion were that two of the defendants were parked in a car outside a bank waiting for the third defendant to emerge from the bank. It was raining heavily and the car was not parked as closely to the bank as it could have been (i.e. in the bank’s parking lot). Rather, the car was in a parking lot next door to the bank, adjacent to a stockade fence and in a position where it was obscured from the view of the bank. This can hardly be considered incriminating as the bank parking lot was crowded; it simply may have been easier to park a car in the lot next door. The fact that the defendants were slouched in the car is not evidence of criminal activity. The defendants did not make any type of furtive gestures when the officer came within ten feet of the *637 car, see Commonwealth v. Silva, 366 Mass. 402, 407 (1974); they did not look away when the police approached the car. They did not do anything that would give a suspicion of criminal activity. When the third defendant emerged from the bank, there was no evidence that he walked in anything other than a normal manner as he approached the Acura. Further, even if late November could be considered the pre-Christmas season (so that bank robberies were in vogue) there was nothing to indicate that a bank robbery had occurred or was about to occur at either the Citizens or the Fleet Bank. Although a series of factors, each innocent in itself, may, when taken together, amount to the requisite reasonable belief, see Fraser, supra, at 545, the innocent factors in this case do not provide articulable facts to support the reasonable suspicion of criminal conduct required for a threshold inquiry.[4]
The Commonwealth cites cases such as Commonwealth v. Fraser, 410 Mass. 564 (1991), and Commonwealth v. Wren, 391 Mass. 705 (1984). These cases are distinguishable, however. Fraser involved safety implications because of the report of a man with a gun, which implications are not present in the instant case. In Wren, the observations were of suspicious activity at night in a quiet, residential neighborhood which justified a reasonable suspicion that the defendant was casing the neighborhood. The observations in the present case, by contrast, occurred during a time when the bank was open for business.
The defendants further argue that the pat-frisk was illegal. Having reached the conclusion that the initial stop was improper, it is not necessary to resolve this issue.
ORDER
For the foregoing reasons, the defendants’ motions to suppress are ALLOWED.

 The officer never testified that he had observed that the occupants of the car were black or even male. He called them “individuals.” That he saw that they were black males may be inferred from his testimony that, upon his return to his cruiser, he made a radio transmission to headquarters that he believed he had located the individuals named in the communication concerning the Citizens Bank. In any event, my decision does not hinge on a resolution of this factor.

 It is unclear what Officer DeFranco was attempting to describe by saying that the Acura left “before he was even seated.” Yet, the Commonwealth appears to consider this a factor that helps to justify the officer’s suspicion.

 The Commonwealth concedes that the defendants were stopped. Clearly, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. United States v. Mendenhall, 446 U.S. 544, 554 (1980), cited in Commonwealth v. Fraser, 410 Mass. 541, 543 (1991).

 I reach this conclusion even assuming that Officer DeFranco observed that the people in the car were black males, a fact which is not entirely clear from the testimony presented. See n.1, infra.