[Cite as *State v. Chase*, 2013-Ohio-2346.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

     Plaintiff-Appellee                      :            C.A. CASE NO.    25322

v.                                               :            T.C. NO.    10CR3257

ERIC D. CHASE                                    :            (Criminal appeal from
                                                              Common Pleas Court)

     Defendant-Appellant                    :

                                                 :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the _____7th_____ day of _____June_____, 2013.

· · · · · · · · · ·

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

ELIZABETH C. SCOTT, Atty. Reg. No. 0076045, 120 W. Second Street, Suite 703, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

· · · · · · · · · ·

FROELICH, J.

    **{¶ 1}**    After the trial court overruled his motion to suppress evidence, Eric D.

Chase pled no contest to having weapons while under disability and carrying a concealed weapon. The trial court found him guilty and sentenced him to twelve months in prison on each count, to be served concurrently with each other and with the 18-month sentence imposed in *State v. Chase*, Montgomery C.P. No. 2011 CR 3364.

{¶ 2}    Chase appeals from the trial court's judgment, claiming that the trial court erred in denying his motion to suppress.[1]    For the following reasons, the trial court's judgment will be affirmed.

I.

{¶ 3}    Huber Heights Police Officers Shawn Waler and Frank Crouse testified on behalf of the State at the hearing on Chase's motion to suppress.    Their testimony established the following facts.

{¶ 4}    During the morning of April 29, 2010, Officers Shawn Waler and Kerry Combs, a crash investigator, were following up on a traffic accident that had occurred.    The officers were in plain clothes and rode in an unmarked patrol car.    Officer Waler testified that the car he was in was "an unmarked patrol car, but it's still obviously a police car."    He stated that it was "a silver Chevy Impala with black wheels, a black spotlight, model antennas, and visible cage over the rear windows, and * * * clear LED flashing lights in the side windows."

{¶ 5}    As the officers stopped for a red light at Chambersburg Road and Brandt

---

[1] On October 9, 2012, this court consolidated *State v. Chase*, 2d Dist. Montgomery No. 25323, the appeal from Montgomery C.P. No. 2011 CR 3364, with this appeal.    Because the events leading to the charges in these cases occurred at separate times and the issues raised on appeal relate to those factual circumstances, we will issue separate opinions and judgment entries for the two appeals.

Pike in Huber Heights, Officer Combs noticed Chase, who was parked at a gas pump at the Speedway on that corner. Chase "took just a moment to stop and stare" at the officers and continued to watch the officers "nervously" as he walked to the front door of the gas station. Waler found Chase's behavior to be "out of the ordinary."

{¶ 6} As Officer Waler drove through the intersection, Officer Combs continued to watch Chase. Officer Combs contacted Officer Frank Crouse, who was working in uniform and in a marked cruiser, and informed him that he and Officer Waler were watching an individual at a gas station and the individual was watching them very intently. Combs provided Crouse a description of the vehicle and its license plate number.

{¶ 7} Waler turned the unmarked patrol car around and stopped in a parking lot across the street from the Speedway. Officer Combs ran the license plate on Chase's vehicle; he did not find any outstanding warrants. The officers learned that Chase's vehicle was not registered to a male, nor was it "registered in the city."

{¶ 8} The officers saw Chase leave the gas station and head south on Brandt Pike. Officers Waler and Combs followed and saw Chase turn into another Speedway gas station that was less than a mile away from the first. Both officers believed that Chase's behavior was suspicious. Waler testified:

> I recognized that a lot of times we have people who have multiple credit cards
> that don't belong to them and they try different credit cards at different
> convenience stores, gas stations, or department stores, whatever the case may
> be, to see if they can get one to work. And I was concerned that there may
> be something like that going on today.

{¶ 9} Officers Waler and Combs circled their vehicle around and stopped across the street from the second Speedway to see if they could observe what was going on. The officers saw Chase looking over his shoulder, trying to maintain visual contact with the unmarked patrol car. Officer Crouse also observed Chase's vehicle as it turned into the gas station. Crouse drove his marked cruiser through the gas station parking lot; Chase "watched [him] continuously" until the cruiser exited the property and drove east.

{¶ 10} Chase left the Speedway and headed north on Brandt Pike. Officers Waler and Combs again followed Chase and kept Officer Crouse updated on their location. Chase passed vehicles while driving in the right lane and exceeded the posted 35 mph speed limit. Waler accelerated to try to keep up with Chase's vehicle; the unmarked patrol car went in excess of 50 mph at more than one point. Chase's car still appeared to be traveling faster than the officers' vehicle.

{¶ 11} Chase made a sharp left turn into a residential neighborhood. After waiting for traffic to pass, the officers followed. The officers located Chase's vehicle near the intersection of Luton Court and Alter Road. Chase was still in the vehicle with his foot on the brake and his seatbelt on. The officers contacted Officer Crouse and told him the location of Chase's vehicle. The officers watched Chase from Alter Road. Chase's vehicle moved forward slightly, then backed up and stopped in front of a residence (where Chase later claimed to live), partially blocking the driveway, a parking violation.

{¶ 12} Officer Waler parked the unmarked patrol car on Luton Court, facing Chase's vehicle but on the opposite side of the street. Waler did not activate any emergency lights. Both officers got out of the patrol car. Officer Waler's badge, firearm, and handcuffs were attached to his belts and were visible.

**{¶ 13}** Officer Waler approached the driver's side of Chase's vehicle, and Chase rolled down his window about two inches. Officer Waler identified himself and explained that he had noticed Chase's behavior of going to two different gas stations, that the behavior seemed suspicious, and the officers wanted to make sure that everything was okay. Waler asked Chase for identification, but Chase stated that he did not have any. Waler asked Chase why he was driving a car without identification; Chase responded that he did not have it with him. The officer tried to obtain a name, date of birth, social security number, driver's license number, or some other identifying information. Chase provided a name and date of birth; he said he did not know his driver's license or social security number. While talking with Chase, Waler noticed an odor of raw marijuana emanating from the vehicle.

**{¶ 14}** Officer Waler went back to the patrol car to run the name and date of birth Chase had provided through the onboard computer. Officer Combs waited by Chase's vehicle. Around this time, Officer Crouse arrived in his marked cruiser and spoke with Officer Combs.

**{¶ 15}** Waler's computer search produced a physical description that did not match Chase's appearance. The computer results also indicated that the individual had a concealed carry permit; Chase had not mentioned that he had a concealed carry permit. Waler stated that, typically, "that's one of the first things they tell whether they have a firearm on them or not. They always tell that they've got that CCW permit." Officer Waler suspected that the name and date of birth that Chase had given was incorrect.

**{¶ 16}** Officer Waler got out of his vehicle and told Officers Combs and Crouse that the information did not appear to match. Officer Crouse went into his cruiser and ran

the information Chase had provided through Justice Web, which has photos from various jails. Crouse told the other officers, "Hey, this guy is not the same person that he gave you." Chase was asked to step out of his vehicle, and Officer Crouse asked him for consent to search the vehicle. Chase declined to consent. Chase was secured, without handcuffs, in Officer Crouse's cruiser.

{¶ 17} Officer Waler told Officer Combs that he had smelled marijuana at the opening of the window while he (Waler) was there. Waler asked Combs, who had previously worked in the narcotics unit, to step up to the car to see if he (Combs) also detected the same odor. Officer Combs went up to Chase's vehicle and reported that he also smelled marijuana and that he could see, from outside the car, some "green leafy material that looked like marijuana in the center console as well."

{¶ 18} Chase remained in the cruiser with Officer Crouse while Officers Waler and Combs both searched Chase's vehicle. The officers found a zippered CD case, which looked "very thick and full inside," on the passenger seat. The case contained a purple Crown Royal bag with several individually wrapped bags of marijuana inside. Officer Combs also found a handgun inside the center console. After the search was completed, Officer Crouse took photographs of the inside of Chase's vehicle and secured two marijuana seeds that were still inside the car.

{¶ 19} Chase ultimately provided Officer Crouse his real name, and Crouse confirmed the information through his computer. Crouse issued citations to Chase. Chase spoke with Officer Combs about providing information and assistance to the police, and Officer Crouse took Chase to the police department so that he could talk to some detectives.

At Chase's request, Officer Crouse also parked Chase's vehicle in the driveway that it had been blocking (which was purportedly either Chase's or his girlfriend's driveway) so that the vehicle would be legally parked.

**{¶ 20}** Chase was indicted for having weapons while under disability, a third-degree felony, and carrying a concealed weapon, a fourth-degree felony. Chase moved to suppress all evidence against him, claiming that he was improperly arrested for a minor misdemeanor (possession of marijuana), that the traffic stop impermissibly extended, and that his arrest for the minor misdemeanor was a pretext to conduct a search of his person and vehicle.

**{¶ 21}** The motion to suppress was denied after a hearing. The trial court reasoned that "whether this [encounter] was characterized initially as a stop or not, the detective approached and identified himself as a police officer and was constitutionally permitted to be where he was at the driver's side window, this particularly in light of the fact that the detectives had observed numerous traffic and parking violations." The trial court further found that, upon seeing and smelling marijuana in the vehicle, the officers were entitled to conduct a warrantless search of the vehicle.

**{¶ 22}** Chase subsequently pled no contest to having weapons while under disability and carrying a concealed weapon. The trial court found him guilty and sentenced him accordingly. Chase appeals from his conviction.

II.

**{¶ 23}** In his sole assignment of error, Chase claims that the trial court erred in denying his motion to suppress evidence. Chase's arguments mirror those presented in the

trial court, namely that officers could not arrest him for a minor misdemeanor, that the arrest was a pretext to search him, and that his detention exceeded the time necessary to issue a ticket for a minor misdemeanor.

{¶ 24} In response to Chase's arguments, the State contends that Officer Waler's initial contact with Chase at the driver's side window was a consensual encounter or, alternatively, the officer had a reasonable articulable suspicion of criminal activity (the traffic violations) to justify an investigatory detention. The State further argues that, once the officer smelled marijuana, he was permitted under the automobile exception to search the vehicle for contraband. Finally, the State asserts that the detention of Chase to effectuate a search of his vehicle was lawful and did not extend beyond the time permitted by law.

{¶ 25} In addressing a motion to suppress, the trial court assumes the role of the trier of fact. *State v. Morgan*, 2d Dist. Montgomery No. 18985, 2002-Ohio-268, citing *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994). The court must determine the credibility of the witnesses and weigh the evidence presented at the hearing. *Id*. In reviewing the trial court's ruling, an appellate court must accept the findings of fact made by the trial court if they are supported by competent, credible evidence. *Id*. However, "the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standard." *Id*.

{¶ 26} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, police officers may briefly stop and/or

temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *State v. Martin*, 2d Dist. Montgomery No. 20270, 2004-Ohio-2738, ¶ 10, citing *Terry*. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). The officer must have more than an inchoate hunch or suspicion to justify an investigatory stop.

{¶ 27} Not every encounter between the police and an individual involves the detention of the individual. "A consensual encounter occurs when a police officer approaches an individual, identifies himself, and requests information, while the individual remains free to disregard the questions and walk away. *United States v. Mendenhall*, 446 U.S. 544, 555–556, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). A consensual encounter may become a seizure if several officers are present and/or if an officer displays his weapon, touches the individual, or uses language or a tone of voice indicating that compliance with the officer's request might be compelled. *Id.* at 556. Consensual encounters do not become seizures simply because the officer does not explicitly advise the individual that he is free to leave. *Id.*" *State v. Rogers*, 2d Dist. Montgomery No. 24848, 2012-Ohio-4753, ¶ 11.

{¶ 28} We agree with the State that Officer Waler's contact with Chase began as a consensual encounter. Chase had already stopped his vehicle in front of a residence when Officer Waler parked his unmarked car and approached Chase. Waler did not activate any

emergency lights, and he parked on the opposite side of the street in a manner that did not restrict Chase's ability to drive away. When Officer Waler approached Chase's vehicle, he identified himself and explained to Chase that Chase's behavior at the two different gas stations appeared suspicious and the officers wanted to make sure that everything was okay. Waler's request to see Chase's identification and the conversation about Chase's lack of identification did not, at the time, convert the encounter into an investigatory detention.

**{¶ 29}** Even if we were to construe the encounter as a traffic stop, Officer Waler had a reasonable articulable suspicion of criminal activity based on his observation of Chase's traffic violations, i.e., Chase's speeding on Brandt Pike and his illegal parking on Luton Court. A police officer may stop and detain a motorist when he has a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit any criminal offense, including a traffic offense, and no independent reasonable and articulable suspicion of other criminal activity is required under *Terry*. *State v. Stewart*, 2d Dist. Montgomery No. 19961, 2004-Ohio-1319, ¶ 13; *Dayton v. Erickson*, 76 Ohio St.3d 3, 665 N.E.2d 1091 (1996).

**{¶ 30}** A traffic stop may last no longer than is necessary to resolve the issue that led to the original stop, absent some specific and articulable facts establishing that further detention was reasonable. *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762 (1997); *State v. Wilkins*, 2d Dist. Montgomery No. 20152, 2004-Ohio-3917, ¶ 10. "When a law enforcement officer stops a vehicle for a traffic violation, the officer may detain the motorist for a period of time sufficient to issue the motorist a citation and to perform routine procedures such as a computer check on the motorist's driver's license, registration and

vehicle plates. 'In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.'" *Wilkins* at ¶ 10, quoting *State v. Aguirre*, 4th Dist. Gallia No. 03CA5, 2003-Ohio-4909.

{¶ 31} Once the reasonable period of time for issuing the traffic citation has passed, a police officer must have a reasonable articulable suspicion of criminal activity in order to continue the detention. *Wilkins* at ¶ 11. As explained by Ohio Supreme Court:

> When a police officer's objective justification to continue detention of a person stopped for a traffic violation for the purpose of searching the person's vehicle is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continued detention to conduct a search constitutes an illegal seizure.

*Robinette* at paragraph one of the syllabus.

{¶ 32} Regardless of whether the encounter began as a consensual encounter or an investigatory detention, Chase was not free to leave when Officer Waler went back to his patrol car to check the identifying information that Chase had provided. At that juncture, however, Officer Waler had a reasonable suspicion of criminal activity to justify Chase's continued detention. Waler had smelled what he believed to be an odor of raw marijuana emanating from Chase's vehicle, and Chase had lowered the driver's side window only about two inches, which, based on Waler's training and experience, indicated to the officer that Chase might be trying to hide something within the vehicle. In addition, once Officer

Waler ran the name and date of birth that Chase had provided through his computer, he learned that the information Chase had provided was false. Based on the totality of the circumstances, the officers were entitled to detain Chase not only for the time necessary to check Chase's identity and to issue a traffic citation, but also for the purpose of investigating Chase's possible possession of marijuana.

{¶ 33} Once Officer Waler notified Officers Combs and Crouse that the identifying information Chase had provided was not correct, Chase was asked to exit his vehicle. A police officer may require the occupant(s) of a motor vehicle to exit the vehicle because of the legitimate safety concerns of both the officer and the occupant(s). *See Pennsylvania v. Mimms*, 434 U.S. 106, 109-11, 98 S.Ct. 330, 54 L.Ed.2d 331(1977); *State v. Evans*, 67 Ohio St.3d 405, 407-08, 618 N.E.2d 162 (1993). Chase was secured in Officer Crouse's cruiser while the other officers searched Chase's vehicle; however, Chase was not handcuffed, and there is no indication that he was placed under arrest at that time.

{¶ 34} Finally, Officers Waler and Combs lawfully searched Chase's vehicle under the automobile exception to the Fourth Amendment's warrant requirement. Under the automobile exception, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains contraband, and exigent circumstances necessitate a search or seizure. *State v. Mills*, 62 Ohio St.3d 357, 367, 582 N.E.2d 972 (1992); *Maryland v. Dyson*, 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.E.2d 442 (1999). A vehicle's mobility is the traditional justification for this exception to the warrant requirement. *Mills* at 367; *Dyson* at 467. "[T]he automobile exception does not have a separate exigency requirement: 'If a car is readily mobile and probable cause exists to

believe it contains contraband, the Fourth Amendment * * * permits police to search the vehicle without more.'"[2]  *Dyson* at 467, quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996).   The search may extend to closed containers within the vehicle that may conceal the object of the search.  *See Wyoming v. Houghton*, 526 U.S. 295, 301-02, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999).   "The smell of marijuana, alone, by a person qualified to recognize the odor, is sufficient to establish probable cause to conduct a search."  *State v. Moore*, 90 Ohio St.3d 47, 734 N.E.2d 804 (2000).

{¶ 35}   Officer Waler testified that both he and Officer Combs detected the odor of raw marijuana coming from Chase's vehicle through the partially opened window.   Officer Combs reported to Officer Waler that he could see "green leafy material that looked like marijuana in the center console as well."   This testimony established that the officers had probable cause to believe that Chase's vehicle contained marijuana.   The officers were thus permitted to search the passenger compartment of Chase's vehicle for marijuana under the automobile exception.   Upon searching the passenger compartment of Chase's vehicle, Officers Waler and Combs lawfully recovered a handgun and a zippered CD case containing a purple Crown Royal bag with several individually wrapped bags of marijuana.

{¶ 36}   In summary, the trial court did not err when it denied Chase's motion to suppress.   The assignment of error is overruled.

---

[2] In *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, the Ohio Supreme Court clarified that "[a] trunk and a passenger compartment of an automobile are subject to different standards of probable cause to conduct searches" under the automobile exception.   *Id.* at ¶ 51.   The supreme court held that the odor of burnt marijuana in the passenger compartment of a vehicle did not, standing alone, establish probable cause for a warrantless search of the trunk of the vehicle.   *Id.* at ¶ 52.   As the search in this case did not extend to the trunk of Chase's vehicle, we need not discuss *Farris* further.

III.

{¶ 37}   The trial court's judgment will be affirmed.

. . . . . . . . . .

FAIN, P.J. and WELBAUM, J., concur.

Copies mailed to:

Michele D. Phipps
Elizabeth C. Scott
Hon. Gregory F. Singer