Filed 10/28/13  In re C.G. CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re G.C., a Person Coming Under the Juvenile Court Law. | H038607 (Monterey County Super. Ct. No. J46497) |
| THE PEOPLE, Plaintiff and Respondent, v. G.C., Defendant and Appellant. | |

Appellant G.C. admitted the allegations of a petition under Welfare and Institutions Code section 602 charging him with possession of cocaine, possession of a concealable firearm, bringing a firearm into a juvenile facility, and participating in a criminal street gang.  On appeal he contends that the trial court erred by (1) denying his motion to suppress evidence; (2) omitting a scienter element from several probation conditions; and (3) failing to declare his offenses to be either felonies or misdemeanors, as required by Welfare and Institutions Code section 702.  He further contends that his attorney rendered ineffective assistance at the suppression hearing.  We will hold that

some of the probation conditions must be corrected and that further proceedings under section 702 are required. In all other respects we will affirm the judgment.[1]

## BACKGROUND

Viewed most favorably to the judgment, evidence at the suppression hearing established that on the afternoon of May 12, 2011, Salinas Police Officers Robert Zuniga and Gerardo Magana were driving through the North Gate Village apartment complex, with which they were familiar because of recent service calls prompted by Norteño gang members congregating in the area, drinking alcohol, and causing disturbances with security personnel. The officers noticed two cars next to each other in the complex's parking area. One was a green Toyota Camry occupied by five people. The other was a white Dodge Intrepid, next to which stood two men with what appeared to be an alcoholic beverage resting on the hood.

Officer Zuniga stopped the patrol car behind the Camry, without engaging the patrol car lights, and both officers approached the cars on foot. Officer Magana approached the Intrepid while Officer Zuniga approached the Camry. Upon detecting the odor of marijuana emerging through the Camry's open windows, Officer Zuniga called for additional units. He recognized the driver and three of the passengers, including G.C., and knew all of them to be Norteño gang members. G.C. was sitting in the front passenger seat and making furtive movements toward the floorboard. Because of this, and because the Camry's rear floorboard was out of sight, Officer Zuniga directed the occupants to place their hands where he could see them. The rear passengers complied immediately, but G.C. had to be asked a second time.

After backup arrived, Officer Zuniga directed the driver to step out of the vehicle. Officer Zuniga asked whether there was "anything illegal" in the car, to which the driver

---

[1] By separate order we will deny G.C.'s petition for writ of habeas corpus, which asserts ineffective assistance of counsel.

2

replied that "there may be marijuana in his vehicle." Asked about firearms, he hesitated to answer; asked again, he looked at the ground and said, "[W]ell, there shouldn't be any firearms." Asked a third time whether anyone in the car had a firearm, "Once again he hesitated and said he didn't know."

Officer Zuniga pat-searched the driver and began to pat-search the rear passengers. Meanwhile his cover, Officer Garcia, twice directed G.C., who was still seated in the passenger seat, to place his hands where he could see them, and then directed G.C. to step out of the car. G.C. complied, but was wearing only one shoe. Officer Garcia conducted an initial pat-search of G.C. Officer Zuniga then searched the Camry for marijuana. As he did so, another officer saw the driver withdraw from his left sock and discard a baggie containing what looked like cocaine or methamphetamine. He seized the baggie and gave it to Officer Zuniga, reporting its provenance. Officer Garcia next searched G.C. a second time, to determine the nature of a bulge he had detected near G.C.'s left hip during his initial pat-search. This second search revealed a pair of gloves.

After completing his search of the Camry and uncovering the remnant of a marijuana joint, Officer Zuniga redirected his attention to G.C., believing that he might be hiding contraband in his socks. That belief was based on the furtive movements G.C. had made toward his feet while still in the Camry, his wearing only one shoe when he emerged from the car, and the officer's familiarity with gang members' practice of "split[ting] the dope"—which occurs, he explained, when two gang members divide a quantity of drugs between themselves to reduce the chance that police officers will find the full quantity during a search.[2]

_____

**[2]** The transcript in this case is an example of why the electronic recording of all judicial proceedings should be freely permitted, if not required. The practice of "split[ting] the dope" first appears in the transcript as "*sniff*[ing] the dope." (Italics added.) Fortunately, later testimony makes the mistranscription obvious.

While G.C. sat on the sidewalk or curb, Officer Zuniga asked him why he had one shoe off. G.C. replied that he had been "trying to put his shoe on when we were trying to come in contact with him." Officer Zuniga "asked him once again, why did he have one shoe off in the first place, he could not provide me with an answer." Officer Zuniga "asked him if he wouldn't mind taking his sock off." G.C. said "sure, I'll take my sock off," whereupon "he removed his right sock," "turned it inside out," and "threw the sock down on the ground." Officer Zuniga looked in the sock, but it contained nothing. "I then asked him if he wouldn't mind taking off his shoe," to which G.C. "said something in the nature of sure, I'll take my shoe off," which he did. At the officer's further request, G.C. handed the shoe to him. It apparently contained nothing. The officer then asked G.C. "if he could lift his pant leg up for me so I could see the top of his sock." G.C. raised the pant leg only slightly. Officer Zuniga "asked him if he would mind pulling it up a little bit more." When he did so, he revealed "a fairly large bulge in the left—his left sock, at the top of his sock." Officer Zuniga "immediately thought it was going to be illegal contraband or a weapon, something that was big enough to hold in his sock. It was a fairly large bulge." Because it was in the immediate vicinity of G.C.'s hands, it raised concerns of officer safety; therefore Officer Zuniga "reached forward and retrieved the item from the front of his sock." It proved to be "an I.D. type of holder with a plastic cover," in which was visible "what looked to be money bundled up, shoved inside of the holder, so it caused it to kind of bulge out." As he examined this item he saw, "[o]ut of the corner of [his] eye," G.C. "manipulating his pant legs to put them back down and manipulate his left sock," whereupon the officer "immediately s[aw] a white plastic or a gray plastic baggie fall from his sock area." He believed it to be cocaine.

According to the probation report, G.C. was arrested and booked into juvenile hall, where he was unable to pass through a metal detector without triggering it. Upon a further search, a staff member felt a heavy object in the area of G.C.'s left inner thigh. When asked if he was sure he did not have "anything on him," G.C. remained silent. The

4

staff member told him that " 'now would be the time to be honest,' " whereupon G.C. pulled a loaded .25 caliber handgun from his clothes and handed it to the staff member. The gun had been "under his shorts, in between his legs, directly next to his testicles."

The district attorney filed a petition under Welfare and Institutions Code section 602, subdivision (a). As ultimately amended, it charged G.C. with (1) possession of cocaine (Health & Saf. Code, § 11350, subd. (a)); (2) possession of a concealable firearm by a minor (Pen. Code, § 29610), with an enhancement for gang-relatedness (Pen. Code, § 186.22, subd. (b)(1)); (3) possession of a firearm in a juvenile facility (Welf. & Inst. Code, § 871.5, subd. (a)); and (4) unlawful participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)).

G.C. moved to suppress all evidence flowing from the police encounter of May 12, 2011, on the ground that it was the product of an illegal search and seizure. The trial court conducted a hearing at which the participating officers testified. Defense counsel argued that a detention occurred when Officer Zuniga parked his patrol car behind the green Camry in which G.C. was a passenger; that there was no legal justification for a detention at that point; and that any evidence secured thereafter was the fruit of an illegal detention. In the alternative, counsel argued, the detention of G.C. was unreasonably prolonged because any cause for such a detention disappeared after officers searched him twice and found neither contraband nor weapon. Any consent that defendant might have given for a later search of his sock was vitiated, counsel argued, by the illegality of the detention then in progress.

The court concluded that G.C. was not detained until he was directed to exit the Camry and sit on the curb. The mere parking of Officer Zuniga's patrol car behind the Camry and companion vehicle was not a detention, the court reasoned, because there was plenty of room for any of the cars to back out and pull away. The court implicitly concluded that the officer was entitled to approach the car on foot, and expressly found that the marijuana vapor emerging from the car provided sufficient cause to search it for

5

marijuana. At that point, the court reasoned, "he had the right to order, either have the people remain in the car or order them out of the car, his choice." Defendant's repeated furtive gestures toward the floorboards raised legitimate concerns about officer safety.[3] When one of his companions discarded what appeared to be a controlled substance, and defendant emerged from the car wearing only one shoe, the officer justifiably suspected "dope splitting," which supported an inference that defendant was in possession of additional cocaine. The court also raised the possibility, though it stopped short of finding, that defendant had consented to the search of his shoes and sock. The court ultimately concluded that "the officer was justified and reasonable in doing what he did and I think that any reasonable officer in that situation, a confronted[4] officer Zuniga would have been justified in doing what they did."

Upon the denial of his suppression motion, G.C. admitted all allegations of the petition. Later, after probation officials determined that G.C. was not eligible for deferred entry of judgment, the prosecutor dismissed count 4—the criminal street gang participation charge, and the remaining admissions were allowed to stand. G.C. was declared a ward of the juvenile court and ordered to serve 425 days, minus 75 days of credit for time served, in the Monterey County Probation Department Youth Center Program. The court imposed an open term of probation with several conditions.

<h3 style="text-align:center">DISCUSSION</h3>

## I.    *Lawfulness of Detention*

G.C. contends that the trial court erred in its determination that a detention did not occur until after Officer Zuniga approached the Camry and smelled marijuana. Citing

---

**3** In addition, though the court did not cite the fact, it seems obviously relevant that when the driver was asked about the presence of weapons, his denials were equivocal, hesitant, and evasive.

**4** So transcribed; presumably, "in that situation *that* confronted."

*United States v. Mendenhall* (1980) 446 U.S. 544, 554, he argues that a detention occurred when Officer Zuniga stopped his patrol car behind the Camry, because the manner of his doing so would have "cause[d] reasonable people to believe that they [we]re not free to leave." Because no reasonable suspicion then existed to detain anyone, G.C. contends, the ensuing seizures of cocaine and a gun are fruits of an unlawful detention, which the court should have suppressed.

On review of the denial of a motion to suppress, we defer to the trial court's factual findings insofar as they are supported by substantial evidence, but independently assess whether, under the facts permissibly found, the challenged search and seizure conform to the constitutional standards of reasonableness. (*People v. Leyba* (1981) 29 Cal.3d 591, 596-597.) Here the only fact suggesting that the occupants of the Camry were not free to leave was that Officer Zuniga had stopped his car behind them. The trial court quite properly found, however, that his car did not block theirs and would not have prevented them from leaving. There was no evidence that the he had brought his car to a screeching halt or had leapt from it with a hand on his holster. Indeed, his approach was so unobtrusive that at least one occupant of the neighboring car was unaware of the police car's arrival. None of the car's special lights, horns, or sirens had been activated. A reasonable person in G.C.'s position, noting the police car's arrival, might well wonder whether the police were interested in him and, if so, why; but that is not the same as believing that one is under official constraint to remain where one is.

G.C. cites *People v. Jones* (1991) 228 Cal.App.3d 519 (*Jones*), where a police officer in a patrol vehicle observed three men standing on a street corner in an area known for narcotics sales and use, and watched one man hand currency to another. (*Id.*, at p. 521.) The officer pulled his car to the wrong side of the road and parked diagonally against traffic about 10 feet from the men. (*Id.*, at p. 522.) He stepped from his car and asked the defendant, who began walking away, to stop. (*Ibid.*) The court acknowledged that under *Florida v. Royer* (1983) 460 U.S. 491, 497, an officer does not violate the

7

Fourth Amendment merely by approaching a person in a public place and asking him if he is willing to answer some questions. (*Jones, supra,* 228 Cal.App.3d at p. 523.) But it found that rule inapplicable, holding that "a reasonable man does not believe he is free to leave when directed to stop by a police officer who has arrived suddenly and parked his car in such a way as to obstruct traffic." (*Ibid.*)

Here there was no indication that the police had arrived "suddenly" or that their car was obstructing traffic. More importantly, the holding in *Jones* did not depend solely or even primarily on the positioning of the patrol car but on the conjunction of that circumstance with a police "direct[ive] to stop." (*Jones, supra,* 228 Cal.App.3d at p. 523.) Here, as we have said, G.C. relies entirely on the positioning of the police car. Acceptance of this view would seem to mean that a detention invariably occurs whenever police officers stop a car behind an occupied vehicle, unless perhaps they somehow conduct themselves so as to affirmatively dispel any suspicion that they intend to contact the occupants of the other vehicle. While such a rule might warrant serious consideration if the slate of relevant precedent were otherwise clean, we do not believe it can be sustained under current Fourth Amendment jurisprudence.

G.C. also cites *People v. Wilkins* (1986) 186 Cal.App.3d 804, 809, where two then-members of this court concluded that a detention occurred when a police officer "stopped his marked patrol vehicle behind the parked station wagon in such a way that the exit of the parked vehicle was prevented." The third justice did not dispute that this was a detention, but questioned whether it was a factor in the officer's detection of contraband. (*Id.* at p. 812 (conc. opn. of Agliano, P.J.).) The majority opinion cited *People v. Bailey* (1985) 176 Cal.App.3d 402, in which another divided panel of this court found that a detention occurred when a police officer pulled behind a vehicle in a parking lot and turned on its emergency lights. Again the third justice "assum[ed], for the sake of argument, that the display of lights was a demonstration of authority which restrained defendant's freedom to leave," but concluded that the evidence ultimately seized was not

8

the fruit of the detention. (*Id.* at p. 407 (dis. opn. of Agliano, J.).) We agree that a detention occurred in both of those cases, but find them obviously distinguishable with respect to the manifestations of restraint applied by the officers: one used a police car to physically obstruct the subject's movements; the other caused his car to issue a nonverbal but universally understood signal of official restraint.

Here, we must defer to the trial court's finding that Officer Zuniga did not park his car in a way that physically obstructed the Camry's departure. Nor did he issue any signal that the Camry or its occupants were not free to leave. Again, his approach was so unobtrusive that at least one occupant of the neighboring car was unaware of the police car's arrival. We see nothing that would have told the driver he was not free to drive away, or that would have told G.C. he was not free to open the passenger door and walk away. So far as the record shows, the only reason he failed to do so is that he was busy "split[ting] the dope" with the car's driver. In view of all the circumstances, we cannot say that the trial court erred in concluding that no detention occurred until after Officer Zuniga detected marijuana fumes. Accordingly, we find no error in the trial court's denial of the motion to suppress evidence.

## II. *Assistance of Counsel*

G.C. argues that his trial counsel rendered ineffective assistance of counsel by failing to argue, in support of the suppression motion, that (1) any consent G.C. gave to any search by Officer Zuniga was vitiated by a preexisting illegal seizure; (2) any such consent was invalid for the further reason that it was the product of coercion; and (3) the search yielding the cocaine was conducted without probable cause. Minor further argues that trial counsel's performance was deficient because counsel failed to adequately demonstrate that the handgun in evidence was also the product of an illegal seizure. He

9

argues that these claims are properly raised on direct appeal because the error is manifest from the record.[5]

To prevail on his claim of ineffective assistance of counsel, G.C. must show both that his trial attorney's performance was deficient and that the deficiency was prejudicial to his defense. (*Strickland v. Washington* (1984) 466 U.S. 668, 686.) We find it unnecessary to determine whether counsel should have raised the arguments now posited because we are satisfied that his failure to do so had no effect on the outcome. This is because the trial court was almost certain to find, on the facts before it, that Officer Zuniga had probable cause to search G.C. for cocaine. This conclusion makes it immaterial whether minor consented to the search, and also obviates any concern about the subsequent discovery of the gun, which was an inevitable consequence of G.C.'s lawful arrest for possession of cocaine.

Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts[.]" (*Illinois v. Gates* (1983) 462 U.S. 213, 232 (*Gates*).) Probable cause is less than proof beyond a reasonable doubt, less than a preponderance of the evidence, and less than a prima facie showing. (*People v. Tuadles* (1992) 7 Cal.App.4th 1777, 1783, citing *Gates*, *supra*, 462 U.S. at p. 235.) Probable cause refers to "a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 667.) While we defer to the trial court's factual findings, express or implied, where supported by substantial evidence, we exercise our independent judgment to determine whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment. (*People v. Weaver* (2001) 26 Cal.4th 876, 924.) We apply the "totality-of-the-circumstances" approach to determine whether

---

[5] The asserted ineffectiveness of counsel is also the basis for G.C.'s separate petition for habeas corpus which, as previously noted, we deny today.

probable cause exists for a warrantless search. (*People v. Carvajal* (1988) 202 Cal.App.3d 487, 498.)

Officer Zuniga testified that he suspected G.C. might have narcotics or controlled substances in his sock, and that this suspicion rested on the following facts: As he initially approached the Camry, he saw G.C. making furtive movements toward the floorboard. G.C. complied only tardily with repeated directives to place his hands where officers could see them. When G.C. stepped from the car, he was wearing one shoe but not the other. A fellow occupant of the car—the driver—discarded a baggie from his sock containing what looked like methamphetamine or cocaine. Finally, Officer Zuniga testified that it is not uncommon for gang members to "split the dope," i.e., divide drugs among themselves to minimize the odds that law enforcement officers will find them all.

These facts were sufficient to support a strong suspicion that G.C. was in possession of "dope." One of his companions had concealed some in a sock, and G.C. was stubbornly doing something around his feet throughout the time he remained seated in the car. When he emerged from the car wearing only one shoe, officers were more than justified in suspecting that he had been interrupted in the act of concealing a controlled substance, which could probably be found—as indeed it was—in either a shoe or a sock. Thus, under the totality of the circumstances, the search was supported by probable cause, and was valid with or without consent. Because minor's ineffective assistance of counsel claims all hinge on the posited invalidity of the search, none of them would have been likely to produce an outcome more favorable to G.C. His objections to counsel's performance therefore fail for lack of prejudice.

## III.    *Probation Conditions*

G.C. challenges four of his probation conditions as unconstitutionally overbroad and violative of due process in that they impose strict liability without requiring guilty knowledge or other culpable mental state. Although G.C. did not object to the challenged conditions in the trial court, his contentions are cognizable on appeal because they

11

present a pure question of law that may be resolved without reference to the sentencing record. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887–888 (*Sheena K.*); *People v. Kim* (2011) 193 Cal.App.4th 836, 842.) We review G.C.'s challenges under a de novo standard of review. (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

The challenged conditions state as follows:

"17. You are not to consume or possess any intoxicants, alcohol, narcotics, other controlled substances, related paraphernalia, poisons, or illegal drugs, including marijuana. You are not to be with anyone known to you who is using or possessing any illegal intoxicants, narcotics or drugs. Do not inhale or attempt to inhale or consume any substance of any type or nature, used as paint glue, plant material, or any aerosol product.[6] You are not to inject anything into your body unless directed to do so by a medical doctor. You are not to consume any over the counter medication without prior approval of your parent or guardian; you are only to use the prescribed dosage as indicated on the package.

"18. You are not to possess or consume any prescription medication unless directed to do so by a medical doctor. . . .

"[¶] . . . [¶]

"20. You shall not possess any weapons or any type of ammunition.

"21. You are not to be in possession of any scale used to measure ounces or grams."[7]

_____

**6** Although the parties overlook the point, this sentence literally prohibits G.C. from "consum[ing]" any "plant material." We doubt that the court's intention was to prohibit G.C. from eating a salad or French fries. We will strike the quoted phrase. (See fn. 10, *post*.)

**7** The prohibition against possessing any scale "used to measure ounces or grams" is both overbroad and vague. It is potentially overbroad in that *any* scale might be said to "measure ounces or grams," since pounds and kilograms are only ounces and grams writ large. Since this reading would prohibit possession of a bathroom scale, it raises a whiff of absurdity and thereby renders the meaning of the prohibition uncertain. We will

G.C. contends that each of these conditions is overbroad without the further qualification that the proscribed conduct be undertaken "knowingly." He seeks modifications to that effect. Respondent concedes the point as to all the challenged directives save the fourth sentence in condition 17, which prohibits the injection of substances without medical approval. As to that provision respondent contends that a knowledge requirement is superfluous because "one cannot unknowingly 'inject anything' into ones' own body." As in previous cases, we conclude that all of the conditions should be modified.

The United States Supreme Court has shown an aversion to lack of clarity in penal statutes, holding that excessive vagueness can violate the due process clause. (See *Connally v. General Construction Co.* (1926) 269 U.S. 385, 391 ["[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."]; *Lanzetta v. New Jersey* (1939) 306 U.S. 451, 453, fn. omitted ["No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids."].) California courts have often applied the same doctrine to probation conditions. (See *Sheena K.*, *supra*, 40 Cal.4th 875, 890-892, and cases cited.) Many courts, including this one, have found probation conditions vague, overbroad, or both—and have directed modifications accordingly—where they prohibited conduct without requiring knowledge of the circumstances bringing the conduct within the prohibition. (See, e.g., *Sheena K.*, *supra*, at p. 892; *People v. Pirali* (2013) 217 Cal.App.4th 1341, 1350-1353; *In re H.C.* (2009) 175 Cal.App.4th 1067, 1070-1073; *People v. Barajas* (2011) 198 Cal.App.4th 748, 761, fn. 10 [respondent conceded

---

modify the condition to prohibit possession of a scale known to G.C. to be suitable for weighing controlled substances.

modification proper]; *People v. Leon* (2010) 181 Cal.App.4th 943, 950, 951; *People v. Freitas* (2009) 179 Cal.App.4th 747, 750-751, 753 [prohibition against possessing stolen property modified to require knowledge of stolen character]; cf. *In re E. O.* (2010) 188 Cal.App.4th 1149, 1157 [overbroad restriction on court attendance stricken where record failed to disclose purpose to which it might be tailored].)

Where probation conditions are concerned, "[t]he  aim and purpose of the law is to meet the core due process requirement of adequate notice." (*In re H.C.*, *supra*, 175 Cal.App.4th at pp. 1071-1072.)  Thus "[a] probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness.  [Citation.]" (*Sheena K.*, *supra*, 40 Cal.4th 875, 890.)  The goal is to adequately apprise the probationer of the constraints to which he is subject, so that he will not breach the condition.  To incorporate an express requirement of guilty knowledge places no burden on the trial court.  Where that requirement has been omitted, modification of the condition to include it places no burden on a reviewing court.  Reliance on "constructive" notice is a poor substitute for an explicit notice requirement, and a poor instrument for achieving the objectives of probation.  Clarity and precision in defining the probationer's obligations will avoid an excessive delegation of discretion to law enforcement officers while avoiding the expense and inefficiency of unnecessary probation violation proceedings.

We will therefore adhere to our existing practice and modify the challenged conditions to incorporate an express knowledge requirement.

## IV.    *Designation of Wobblers*

Finally, minor contends that the trial court committed reversible erred by failing to declare the status, as felonies or misdemeanors, of his violations of Penal Code section 29610 (minor in possession of a firearm) and Welfare and Institutions Code § 871.5, subdivision (a) (bringing a firearm in to a juvenile facility).  Welfare and Institutions

Code section 702 (§ 702) specifies that when a minor is found to have committed an offense that "would in the case of an adult be punishable alternatively as either a felony or a misdemeanor"—known vernacularly as a wobbler—"the court shall declare the offense to be a misdemeanor or felony." This directive is mandatory, and "requir[es] an explicit declaration by the juvenile court whether an offense would be a felony or misdemeanor in the case of an adult." (*In re Manzy W.* (1997) 14 Cal.4th 1199, 1204 (*Manzy W.*).) One purpose of the requirement is to ensure that the juvenile court is aware of and actually exercises its discretion to treat the offense as a misdemeanor. (*Id.* at p. 1207.)

Respondent contends that that *Manzy W.* does not apply here because, G.C. admitted the counts at issue pursuant to a plea agreement specifying that he admitted them *as felonies*. The record does not bear out this characterization. Immediately following the denial of his suppression motion, G.C. admitted all counts of the amended petition in anticipation of receiving deferred entry of judgment. The probation department later concluded, and it was ultimately stipulated, that he was not eligible for that disposition. At that point it was agreed that the prosecutor would dismiss a charge of participation in a criminal street gang charge (count 4), while G.C.'s admission of the remaining counts would remain in place. There is no showing in the record that this dismissal was conditioned upon admissions to the remaining charges *as felonies*.

Respondent cites two pages from the record in support of a contrary reading. The first contains handwritten entries in the form minute order memorializing G.C.'s initial admission of the charges. The entries appear in a list of four counts recited to have been "admitted and found to be true as alleged." After the number of each count appears the code section admitted to have been violated, followed in at least three instances by the notation "fel."[8] Assuming this entry means that G.C. admitted each violation *as a felony*,

_____

[8] We say "at least" three instances because the fourth entry, while probably containing the same notation, is only marginally legible.

15

nothing in the transcript of the plea proceeding indicates that G.C. voluntarily assented to any such term. It is true that in discussing the maximum time of confinement to which his admissions would expose him, the court and attorneys referred to certain charges as felonies. It is a virtual certainty, however, that this entire exchange was unintelligible to G.C.; only the closest parsing, code in hand, renders it intelligible to us. When it came to the actual taking of G.C.'s admissions, the only allusion to the status of the offenses as felonies or misdemeanors was the question whether he "admit[ted] that [he was] in possession of cocaine as a felony, alleged in count 1, on May 12 of this year." By answering that question affirmatively he may have admitted that count 1 was a felony. But that count was not a wobbler in the first place. At no time was he asked to, nor did he, accede to such a characterization of the other counts.

As we recently acknowledged, "though the older rule is to give preference to the reporter's transcript where there is a conflict, the modern rule is that if the clerk's and reporter's transcript cannot be reconciled, the part of the record that will prevail is the one that should be given greater credence in the circumstances of the case." (*People v. Pirali, supra,* 217 Cal.App.4th 1341, 1346, citing *People v. Smith* (1983) 33 Cal.3d 596, 599.) We see no reason here to think that the clerk's transcript "should be given greater credence" with respect to the substance and scope of G.C.'s admissions than should the record of the admissions themselves. So far as that record shows, he was never asked to admit the wobblers as felonies.[9]

Nor is it likely that an express admission to the charges "as felonies" would satisfy the requirements of section 702, as applied in *Manzy W.* Conceivably the failure to make

_____

[9] The other page cited by respondent appears in the probation officer's report. Nothing on that page has any bearing on the question under scrutiny. In any event, we cannot readily conceive of circumstances in which a recital in a probation report would prevail over the contents of the reporter's transcript with respect to the terms and conditions on which a plea was entered.

16

the required declaration might be viewed as *harmless* if the parties and court explicitly agreed that the court would not exercise its discretion to deem an admitted wobbler a misdemeanor. But to even reach that issue we would require a record showing unmistakably that both the minor and the juvenile court acceded to that term. Certainly it would not be enough that the minor admitted a charge that was characterized as a felony in the accusatory pleading. This was the case here—but it was also the case in a decision quoted and discussed at length in *Manzy W.*, 14 Cal.4th 1199: " 'The record does indicate that the offense was described as a felony in the . . . petition and that appellant admitted the truth of the charge. However, the preparation of a petition is in the hands of the prosecutor, not the court. The mere specification in the petition of an alternative felony/misdemeanor offense as a felony has been held insufficient to show that the court made the decision and finding required by . . . section 702. [Citation.] Similarly, the setting of a felony-level maximum period of confinement has been held inadequate to comply with the mandate of . . . section 702. [Citation.] While the minutes of the dispositional hearing recited that the minor was committed to the Youth Authority "for conviction of felony, to wit: Vio. 245a PC," the transcript of the dispositional hearing . . . "does not support this notation." [Citation.]' " (*Id.* at pp. 1207-1208, quoting *In re Ricky H.* (1981) 30 Cal.3d 176, 191.)

We conclude that insofar as the charged offenses were wobblers, the court was required to make an express declaration in conformity with section 702. Respondent concedes that the charge of possessing a firearm in a juvenile facility (Welf. & Inst. Code, § 871.5, subd. (a)), as alleged in count 3, is a wobbler. The concession is well taken. The statute provides for punishment by "imprisonment in a county jail for not more than one year or by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code." (Welf. & Inst. Code, § 871.5, subd. (a); see Pen. Code, §§ 17-19.) Respondent contends, however, that the other admitted counts are unequivocally felonies, and thus outside section 702. This is true with respect to count 1, charging unlawful

17

possession of cocaine in violation of Health and Safety Code section 11350, subdivision (a). (See *People v. Myers* (2009) 170 Cal.App.4th 512, 516 ["The plain language of Health & Safety Code section 11350 makes it clear that its violation is a felony that cannot be reduced to a misdemeanor."].) The same cannot be said of possession of a concealable firearm by a minor, in violation of Penal Code section 29610, as alleged in count 2. The sentence for that offense is confinement either "pursuant to subdivision (h) of section 1170" (i.e, a felony sentence) or "in a county jail" (a misdemeanor sentence). (Pen. Code, § 29700, subd. (a); *id*., subd. (a)(3) [applying this provision to all cases of firearm possession in violation of section 29610].) Penal Code sections 29610 and 29700 are new code sections; their predecessor was former Welfare and Institutions Code section 12101. That section was held to describe a wobbler because it provided for "imprisonment in the state prison or in a county jail." (*In re Jose T.* (1997) 58 Cal.App.4th 1218, 1220.) Although Penal Code section 29700, subdivision (a), now refers to "imprisonment pursuant to subdivision (h)" instead of "imprisonment in the state prison," it still provides alternatively for a felony sentence or for imprisonment in a county jail. (See Pen. Code, §§ 17-19.) Thus the offense now codified at Penal Code section 29610 continues to be a wobbler.

Remand is required for an express declaration pursuant to Welfare and Institutions Code section 702 regarding counts 2 and 3, and if thereby made necessary, for recalculation of the maximum period of physical confinement. (See *Manzy W.*, *supra*, 14 Cal.4th at p. 1211.)

DISPOSITION

The challenged conditions of probation are modified to provide as set forth in the margin.[10] The matter is remanded for an express declaration pursuant to Welfare and

---

[10] "17. You are not to consume or possess any materials known to you to be intoxicants, alcohol, narcotics, other controlled substances, related paraphernalia, poisons, or illegal drugs, including marijuana. You are not to be with anyone who you

18

Institutions Code section 702 regarding counts 2 and 3, and for such further proceedings as may be necessitated thereby.  In all other respects the order appealed from is affirmed.

---

know is under the influence or in possession of any illegal intoxicants, narcotics or drugs. You are not to knowingly or intentionally inhale, or attempt to inhale or consume, any substance used as paint or glue, or any aerosol product.  You are not to knowingly or intentionally inject anything into your body unless directed to do so by a medical doctor. You are not to knowingly consume any over-the-counter medication without prior approval of your parent or guardian.  You are not to knowingly take more of any medication than the dosage indicated on the package or prescribed by a physician.

"18.  You are not to possess or consume any substance known to you to be a prescription medication unless directed to do so by a medical doctor . . . .

"[¶] . . . [¶]

"20.  You shall not possess any object or material known to you to constitute a weapon or ammunition.

"21.  You are not to be in possession of any object known to you to constitute a scale suitable for weighing controlled substances."

19

_____

RUSHING, P.J.

WE CONCUR:

_____

ELIA, J.

_____

MÁRQUEZ, J.